2001 D.S.D. 5

**LIVESTOCK MARKETING ASSOCIA-TION**, an association of livestock markets, the Western Organization of Resource Councils, an association of grassroots of organizations that seek to protect natural resources, family farms, and rural communities, and Robert Thullner, Johnny Smith, and Ernie J. Mertz, on behalf of themselves and others similarly situated, Plaintiffs,

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE**, Ann Veneman, Secretary of Agriculture, and the Cattlemen's Beef Board, an organization of cattle producers and importers charged with implementing the Beef Research and Promotion Order, Defendants.

Civ. 00–1032.

United States District Court,
D. South Dakota,
Northern Division.

Feb. 23, 2001.

Philip C. Olsson, Naomi J.L. Halpern, Olsson, Frank & Weeda, P.C., Washington, DC, Scott N. Heidepriem, Ronald A. Parsons, Jr., Johnson, Heidepriem, Miner, Marlow & Janklow, Sioux Falls, SD, for Plaintiffs.

Ori Lev, Thomas Millet, U.S. Department of Justice, Washington, DC, Ted L. McBride, U.S. Attorney, Sioux Falls, Cheryl Schrempp Dupris, Assistant U.S. Attorney, Pierre, SD, for Defendants.

## MEMORANDUM OPINION AND ORDER

KORNMANN, District Judge.

### INTRODUCTION

[¶ 1] Plaintiffs instituted this action to challenge certain activities in connection with the Beef Promotion and Research Act (Title XVI, Subtitle A, of the Food Security Act of 1985), Pub.L. 99–198, Title XVI, § 1601, and certain actions and inaction on the part of the United States Secretary of Agriculture ("Secretary") and the Cattlemen's Beef Board ("Board"). Plaintiffs seek declaratory and injunctive relief. As required by law, Secretary Veneman has been substituted for Secretary Glickman as a party defendant.

### FINDINGS OF FACT

[¶ 2] The Beef Promotion and Research Act of 1985, 7 U.S.C. §§ 2901–11 ("the Act"), authorizes the Secretary to promulgate a Beef Promotion and Research Order ("Order"), 7 U.S.C. § 2903, to establish a Cattlemen's Beef Promotion and Research Board ("Board"), 7 U.S.C. § 2904, and an Operating Committee, 7 U.S.C. § 2904(4)(A), to carry on a "program of promotion and research designed to strengthen the beef industry's position in the marketplace and to maintain and expand domestic and foreign markets and uses for beef and beef products." 7 U.S.C. § 2901(b). The program is funded by mandatory producer and importer contributions of one dollar per head on each transaction. 7 U.S.C. § 2904(8)(C). These mandatory contributions are referred to collectively as the "checkoff."

[¶ 3] On February 14, 1986, the Agricultural Marketing Service ("AMS") issued an invitation to submit proposals for the Order. One proposal was received from the National Cattlemen's Beef Association ("NCBA"). 51 Fed.Reg. 26,132, 26,133. Following publication and a comment period, a final Order was issued on July 18, 1986. 51 Fed.Reg. 26,132 (codified at 7 C.F.R. Part 1260, Subpart A, §§ 101–217). Assessments began on October 1, 1986. 53 Fed.Reg. 5,752.

[¶ 4] The 1985 Act required that, within the first 22 months after the Order was issued, the "trial period," the Secretary was required to conduct a referendum among the persons who were producers and importers during that trial period in order to determine whether the persons subject to the Order believed that it should continue to be in effect. 7 U.S.C. § 2906(a). On March 28, 1988, procedures for the conduct of the required referendum were adopted. 53 Fed.Reg. 9,854 (codified at 7 C.F.R. Part 1260, Subpart C, §§ 1260.401–1260.441). The required ref-

erendum was conducted on May 10, 1988. The Order was approved and assessments subsequently became mandatory. As to those subject to the Order, the only statutory mechanism available to seek suspension or termination of the Order would be for a "representative group comprising ten per centum or more" of the cattle producers subject to the Order to petition the Secretary to hold a referendum. *See* 7 U.S.C. § 2906(b).

[¶ 5] There are currently 13 research and promotion programs for agricultural commodities, namely beef, cotton, dairy, eggs, fluid milk, honey, mushrooms, peanuts, popcorn, pork (recently apparently "voted out" in a referendum but still the object of pending litigation), potatoes, soybeans, and watermelons. 65 Fed.Reg. 5,853. The AMS has developed guidelines to facilitate uniform oversight of the research and promotion programs.

[¶ 6] In 1995, as part of the National Performance Review program to eliminate unnecessary regulations, all references to "referendum" were removed from the research and promotion administrative regulations by the AMS. 60 Fed.Reg. 58,502 (eliminating minor references throughout the beef order regulations); 60 Fed.Reg. 61,196 (eliminating, among others, Subpart C, the procedure for the conduct of beef order referendums, 7 C.F.R. §§ 1260.401– 1260.441). The AMS determined that, since referenda are conducted infrequently, it was not cost-effective to incur printing costs to publish the rules with respect to each of the marketing programs. 60 Fed.Reg. 61,196, 61,197. Consequently, referenda provisions were removed as to the then existing eleven programs. *Id.*

[¶ 7] Although the 1985 Act clearly intends that referenda may be conducted even after the initial referendum, there are no federal regulations or rules as to the conduct of such referenda. Questions of how to do it and when to do it cannot be answered by looking at any regulations or rules. Obviously, it follows that all questions as to procedures and any answers to the questions have not gone through a process in which notice is provided, as well as opportunities to comment.

[¶ 8] Since the establishment of the checkoff in 1986, more than $1 billion has been received from the beef checkoff. During 1997 and 1998, cattle prices were so low that frustrations of many cattle producers were heightened when they were required to deduct checkoff assessments from prices that did not even cover costs of production. In 1998, the Livestock Marketing Association ("LMA") initiated a petition drive to obtain a referendum on the continuation of the beef checkoff program. This was a drive allegedly to allow producers throughout the United States to "have a say" in the decision as to whether the program should be continued, terminated or revised. It would appear, however, that the only choice in a referendum is to vote the program "up or down." Provisions do not exist for an initiative petition to allow a vote on changes being made. The LMA explored the appropriate procedures for submitting such a petition and made inquiries to the Secretary concerning the petition process for a beef referendum.

[¶ 9] During the first full fiscal year that assessments were collected, the Board budgeted and spent just over $500,000 on so-called producer communications. During fiscal year 1988 (following the initial referendum), the board increased producer communications spending to $3,374,863. The following four fiscal years, producer communications expenditures were just over one million dollars per year. Between fiscal years 1993 and 1997, less than a half million dollars was spent annually on producer communications. (Doc. 23, Exh. A1)

[¶ 10] Beginning in mid–1998, the time LMA began the petition drive, the Board initiated a vastly expanded program of "producer communications." In fiscal year 1998, the producer communications budget jumped to $2,780,604. (Doc. 23, Exh. A1) The checkoff division of NCBA committed

an additional $935,000 for producer communications in fiscal year 1998. (Doc. 6, Exh. 13) Defendants contend, however, that only $853,720 of checkoff money was actually spent for producer communications in fiscal year 1998. (Doc. 23, Exh. A1) In fiscal year 1999, the budget was $1,135,000 but $2,893,238 was spent on producer communications. (Doc. 23, Exh. A1) It is rather astounding that expenditures were over 250 percent of what had been actually budgeted. In fiscal year 2000, $3,100,000 was budgeted for producer communications but, as of December 31, 2000 (half-way through the fiscal year), only $366,320 had been actually spent. (Doc. 23, Exh. A1)

[¶ 11] Defendants contend that the increased budget for producer communications was not in response to the referendum petition drive but, rather, in response to concerns that the producers did not understand just what the Board was doing and where producers' checkoff dollars were being spent. The budgets and spending alone are not an indication that checkoff funds were spent illegally but, in conjunction with other findings set forth below, indicate that the purpose of the increased producer communications was to perpetuate the existence of the Board and the checkoff itself. Obviously, if the referendum is blocked or defeated, the Board and the checkoff continue. It is somewhat misleading to refer to extensive and expensive media campaigns as "producer communications" since anyone seeing the advertisements would be subject to political persuasion. This would include not only beef producers but also U.S. Senators, U.S. Representatives, Congressional staff and USDA officials.

[¶ 12] The Board has sent producers communications contending that the checkoff is "fair," "effective," and "accountable." (affidavit of Ronald A. Parsons, Jr., Doc. 6, Exh. 14) The Board's Web site boasted: the "The Beef Checkoff Program—It's Working!" *www.beefboard.com/resources/ index.htm.* The Web site has or had a link

to checkoff information which boasts: "the Beef Checkoff—It's Working." *www.beefboard.org/resources/cbb.chart. htm.* That site states or stated that "a producer Attitude Survey conducted by Aspen Research showed that 68 percent of cattlemen approve of the checkoff." *Id.* That site also advises or did advise browsers that the referendum would cost:

> $3 to $4 million, or about what the checkoff invested in foreign market development during 1997. A cost not figured here is the value of staff and volunteer leader time spent dealing with a referendum instead of other priority issues important to producers.

*Id.* The Web site also has or had a link to the 2000 Beef Board Annual Report which contains or contained, in part, the following information:

> An independent survey conducted this summer showed that beef producers are more ... supportive of the national program ... And more than two-thirds of producers say they support the checkoff program.

*www.beefboard.org/resources/ 00annualreport. pdf.*

[¶ 13] Some of the offending communications (from the standpoint of what the law allows) are channeled through the Board's principal contractor, the NCBA. Defendants contend that the NCBA is an independent non-profit organization that also receives non-checkoff funds from producers and that the Board's restrictions on communications expenditures do not apply to the NCBA. However, the Board promotes the messages proffered by the NCBA. In information provided to producers, the Board suggests that producers visit the NCBA's web site at *www.beef.org.* (affidavit of Ronald A. Parsons, Jr., Doc. 6, Exh. 14) The Board's web site has or had a link called "Newsroom" that in fact links to the NCBA's Web site, *www.beef.org/newsroom/cbb/index.htm.* An unsophisticated browser would not even realize that the "Newsroom" is in fact

posted by the NCBA. Recent news releases in the "Newsroom" announced that:

> Beef producers on the Cattlemen's Beef Board who oversee the national beef checkoff applaud today's announcement by the U.S. Department of Agriculture on beef referendum petitions ... Regular independent surveys show that there is significant support for our efforts.

*Statement by Les McNeill, Chairman, Cattlemen's Beef Board Regarding USDA Signature Verification Announcement,* January 17, 2001.

> In survey after survey, beef producers have expressed broad-based and strong support for industry-funded efforts to increase beef consumer demand ... Because of alleged irregularities in the beef referendum signature-gathering process, the signatures should be closely reviewed.

*Statement by Les McNeill, Chairman, Cattlemen's Beef Board Regarding Pork (sic?) Referendum Vote,* January 12, 2001.

> We find it regrettable that the Livestock Marketing Association and the Western Organization of Resource Councils have chosen to use scarce industry resources to try to stop the USDA from verifying the validity of the LMA beef petition.

*Statement by Les McNeill, Chairman, Cattlemen's Beef Board Regarding the Livestock Marketing Association's Lawsuit Against USDA,* January 3, 2001.

[¶ 14] I find that the words "fair," "effective," and "accountable" are opinions. This is true also of statements to the effect that the checkoff is "working" and that the checkoff is "helping" producers. These messages are all designed to discourage producers and public officials from questioning the activities of the Board, either through a referendum or some other method. It is not accurate for the Board to state that the people making decisions on checkoff funds are producers. Congress in 1985, and then the producers as they existed in 1988, made the initial decision.

Producers in general today make no decisions about use of checkoff funds. The decisions are made by an "operating committee" elected by the Board. The Board, albeit composed of a limited number of producers, is appointed by the Secretary. The communications outlined above are carefully designed to encourage the producers and public officials to support the existence of the Board and the checkoff which supports the Board. These statements constitute a political campaign. These opinions are not measurable. They have no connection with the purpose of the Act, namely promoting the consumption of beef. Payment for these communications with the mandatory checkoff funds forces producers who disagree with the checkoff system or the manner of its operation to help pay for the campaign of their opponents. This amounts to coerced political speech.

[¶ 15] The LMA submitted the petitions to USDA on November 12, 1999. USDA did not even begin to review the database until April of 2000 and that review was not completed until September of 2000. Almost 10 months had elapsed before the USDA took even the first step to verify the signatures and the status of producers to determine whether or not the petitions were valid. During this entire time, cattle producers, including the individual plaintiffs, have continued to make the mandatory checkoff contributions, as required by the Order. Some of these producers have been making payments since 1986 and the USDA has no possibility of identifying beef producers who have contributed to the program.

[¶ 16] Finally, USDA did take action and contracted with a private accounting firm, PricewaterhouseCoopers ("PWC"), to contact a statistical sample of beef referendum petition signers by mail to confirm individual signatures and to obtain sales documents to confirm the status of petition signers as "producers" entitled to sign the referendum petition. PWC issued a preliminary report on January 15, 2001, con-

cluding that there are not sufficient valid signatures to trigger a referendum.

[¶ 17] PWC sent survey forms to referendum petitioners in mid-December, 2000, asking whether the recipient had in fact signed a referendum petition and PWC requested verification of producer status. The survey did not contain a valid control number as required by the Paperwork Reduction Act. 44 U.S.C. § 3512. There is no question that USDA violated the Paperwork Reduction Act.

[¶ 18] Failure to respond to the survey from PWC caused any alleged producer's signature to be invalid. In 1997 and 1998, when LMA representatives met and exchanged correspondence with USDA officials about the information that would be provided by each petitioner, they were never told that individual petitioners would be required to provide personal sales documents, then or later.

[¶ 19] Plaintiffs assert in their amended complaint that:

1. the defendants' delays in handling the petitions constitute unreasonable delay in violation of section 555 and 706(2) of the Administrative Procedures Act ("APA") (Count one),

2. the Secretary's "validation" program is seriously flawed and denied plaintiffs Due Process and Equal Protection (Count two),

3. the Cattlemen's Beef Board's producer communications activities violate both the Beef Promotion and Research Act and the First Amendment by using checkoff funds to disseminate public relations messages, including anti-referendum messages (Count three),

4. the 1985 amendments deleted extensive portions of the Act, eliminating the Secretary's ability to terminate the order on his own initiative or to call a referendum on his own initiative, and eliminated the presumption that the Secretary would call a referendum in response to a petition from ten percent of the producers, resulting in an unconsti-

tutional delegation of legislative authority to the Cattlemen's Beef Board (Count four),

5. the termination and referendum provisions of the 1985 Act provide far less protection against the continuation of an abusive or ineffective program than are provided with respect to similar promotional programs, and therefore violate the rights of cattle producers to equal protection under the Fifth Amendment (Count five), and

6. in implementing the validation program, the Secretary has failed to comply with the requirements of the Paperwork Reduction Act of 1995 (Count six).

[¶ 20] Plaintiffs seek a declaratory judgment that the 1985 Act is unconstitutional. Plaintiffs further seek an injunction prohibiting the Secretary from collecting assessments pursuant to the 1985 Act. Plaintiffs also moved for preliminary injunctive relief, asking the court to order defendants to immediately schedule a referendum election on the termination of the Order or, alternatively, ordering defendants to immediately decide whether to schedule such a referendum. Plaintiffs further seek an order requiring the Board to immediately cease its expenditures for "producer communications" and to make restitution to producers for the in excess of $10 million claimed to have been illegally expended on such communications since 1998.

[¶ 21] The issues raised in Counts three and six came on for hearing on January 25, 2001.

**CONCLUSIONS OF LAW**

**I. JURISDICTION**

[¶ 22] "Federal courts are not courts of general jurisdiction and have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Marine Equipment Management Co. v. United States*, 4 F.3d 643, 646 (8th Cir. 1993) (citing *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541, 106 S.Ct.

1326, 1331, 89 L.Ed.2d 501 (1986) (citing in turn *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803))). "The threshold inquiry in every federal case is whether the court has jurisdiction" and the Eighth Circuit has "admonished district judges to be attentive to a satisfaction of jurisdictional requirements in all cases." *Rock Island Millwork Co. v. Hedges-Gough Lumber Co.*, 337 F.2d 24, 26–27 (8th Cir.1964); *accord Sanders v. Clemco Indus.*, 823 F.2d 214, 216 (8th Cir.1987).

■ [¶ 23] "Jurisdictional issues, whether they involve questions of law or of fact, are for the court to decide." *Osborn v. United States*, 918 F.2d 724, 729 (8th Cir.1990) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir.1981)). "Moreover, because jurisdiction is a threshold question, judicial economy demands that the issue be decided at the outset rather than deferring it until trial ..." *Osborn*, 918 F.2d at 729.

■ [¶ 24] Plaintiffs allege jurisdiction under 28 U.S.C. § 1331, federal question, 28 U.S.C. § 1361, mandamus, 28 U.S.C. §§ 2201–02, declaratory judgment, and 5 U.S.C. § §§ 701–706, the Administrative Procedures Act. The Declaratory Judgment Act does not, of course, confer jurisdiction. Section 1361 also does not provide an independent ground for jurisdiction. *State Highway Commission of Missouri v. Volpe*, 479 F.2d 1099, 1105 n. 6 (8th Cir. 1973) (While § 1361 "is couched in terms of a mandamus action, its liberalizing purpose ... was intended to permit District Courts generally to issue appropriate corrective orders where Federal officials are not acting within the zone of their permissible discretion but are abusing their discretion or otherwise acting contrary to law ..."). Jurisdiction is nonetheless proper since a substantial federal question does exist here, i.e. whether the defendants are acting contrary to federal law and in violation of the First Amendment.

## II.  PRELIMINARY INJUNCTION

■ [¶ 25] The United States Court of Appeals for the Eighth Circuit has identified four factors that a district court, when sitting as a court of equity, should consider in determining whether or not to grant a preliminary injunction:

1.  the threat of irreparable harm to the plaintiff;
2.  the balance of harms inflicted on each party by granting or denying a request for a preliminary injunction;
3.  the probability that the plaintiff will succeed on the merits;  and
4.  the public interest.

*See Shrink Mo. Gov't PAC v. Adams*, 151 F.3d 763, 764 (8th Cir.1998) (citing *Dataphase Sys., Inc., v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981)). The threat of irreparable harm and the probability of success on the merits are the most critical factors. *See Chicago Stadium Corp. v. Scallen*, 530 F.2d 204 (8th Cir.1976). These two factors are also interrelated. *See, e.g., Milwaukee Rentals, Inc. v. Budget Rent A Car Corp.*, 496 F.Supp. 253 (E.D.Wis.1980) (holding that the likelihood of success on the merits factor diminishes in importance but does not vanish entirely once irreparable injury is demonstrated). A more recent case has held that the likelihood of success on the merits is most significant in determining whether or not to issue a preliminary injunction. *See Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 83 (8th Cir.1995). A plaintiff is required to make only a prima facie showing that there has been an invasion of its rights and that a preliminary injunction is essential to the assertion and preservation of those rights. *See, e.g., Board of Governors of the Fed. Reserve Sys. v. DLG Fin. Corp.*, 29 F.3d 993 (5th Cir.1994).

## III.  AUTHORIZED EXPENDITURES

[8]  [¶ 26] The Board is authorized to administer the Order, adopt rules, elect members to serve on the Operating Committee, approve or disapprove budgets, re-

ceive, investigate, and report complaints of violations of the Order, and recommend amendments to the Order. 7 U.S.C. § 2904(2). The Operating Committee is authorized to "develop plans or projects of promotion and advertising, research, consumer information, and industry information, which shall be paid for with assessments collected by the Board." 7 U.S.C. § 2904(4)(B). These powers are redefined in the Order which limits the Operating Committee's powers:

(a) To receive and evaluate, or on its own initiative, develop and budget for plans or projects **to promote** the use of beef and beef products as well as projects for **research, consumer information** and **industry information** and to make recommendations to the Secretary regarding such proposals;

(b) To select committees and subcommittees of Committee members, and to adopt such rules for the conduct of its business as it may deem advisable;

(c) To establish committees of persons other than Committee members to advise the Committee and pay the necessary and reasonable expenses and fees of the members of such committees.

7 C.F.R. § 1260.167. It is clear that the budget is limited to (other than expenses for various committees) promotion, research, consumer information, and industry information. The words "producer communications" are not mentioned and, of course, are not defined. The four purposes of the budget are defined by the Order:

§ 1260.122 *Promotion* means any action, including paid advertising, to advance the image and desirability of beef and beef products with the express intent of improving the competitive position and stimulating sales of beef and beef products in the marketplace.

§ 1260.123 *Research* means studies relative to the effectiveness of market

development and promotion efforts, studies relating to the nutritional value of beef and beef products, other related food science research, and new product development.[1]

§ 1260.124 *Consumer information* means nutritional data and other information that will assist consumers and other persons in making evaluations and decisions regarding the purchasing, preparing, and use of beef and beef products.

§ 1260.125 *Industry information* means information and programs that will lead to the development of new markets, marketing strategies, increased efficiency and activities to enhance the image of the cattle industry.

[¶ 27] Plaintiffs contend in count three of their amended complaint that certain Board communications violate both the Act and the First Amendment in that checkoff funds are being used to disseminate public relations messages, including anti-referendum messages. The Board counters that producer communications have been an integral part of the Board's programs and are required by 7 C.F.R. § 1260.150(k), which provides that the Board shall have the duty:

To prepare and make public, at least annually, a report of its activities carried out and an accounting for funds received and expended.

[¶ 28] The defendants argue that this Court must accept the Board's and USDA's interpretation of this provision as reasonably authorizing producer communications of the sort challenged by plaintiffs. The Court rejects this argument. Certain producer communications being used by the Board are in clear violation of the terms of the Act. They go far beyond any "report of its activities carried out and an accounting for funds received and expended." The word "report" does not translate

---

1. It does not appear that the Board has the authority to, under the guise of research, spend checkoff funds to conduct producer surveys and then to proffer to the producers by way of "news releases" that a majority of them favor continuation of the program.

into what the Board has been doing. Neither the Act nor the CFR contemplate millions of dollars of checkoff funds being used to promote a cause or the existence of the Board itself. The extensive public and mass media campaign is obviously directed to not only producers but to political leaders. Yet checkoff funds may not be used "for the purpose of influencing governmental action or policy." 7 U.S.C. § 2904(10). There are many ways to lobby other than sending a lawyer with a briefcase to Capitol Hill.

### A. Rule 11

[¶ 29] First, the Court will address defendants' contention that none of the communications submitted by plaintiffs state any position on the petition drive or the referendum and are therefore appropriate. (Doc. 22, pp. 15–16) Defendants' assertion runs afoul of Fed.R.Civ.P. 11. The Court is aware of the communications set forth or formerly set forth on the Board's Internet web site, Cattlemen's Beef Board (January 24, 2001) *www.beefboard.org*. Three of the articles published on the Board's Internet Web site link since January 1, 2001, specifically deal with the referendum and the present lawsuit and, as a matter of law, go beyond producer information and state the Board's position as being opposed to the referendum and this lawsuit. Those communications should have been brought to the attention of the Court. At the very least, defendants should not be arguing that, based only upon the communications submitted by the plaintiffs, the Board is not producing communications stating a position on the petition drive or the referendum. It must be noted, however, that the attorney for the defendants was not aware of such activities. No criticism is expressed as to counsel.

### B. Standard of Review

[¶ 30] Congress was explicit about the purposes for which the checkoff funds could be expended. There is no gap in the statute and no gap in the Order. They are explicit in terms as to the use of the checkoff funds. There is no authority to use the checkoff funds for producer information of the type being used to promote the existence of the Board and the checkoff itself.

[¶ 31] The 1976 Beef Research and Information Act, Pub.L. No. 94–294, the predecessor to the 1985 Beef Promotion and Research Act, differed substantially from the 1985 Act. In particular, under the 1976 Act, the Order authorized the plan to include "producer information." The term "producer information" is noticeably absent from the 1985 Act. It was removed by Congress. This may well show a legislative intent that no producer communications of any kind may be utilized. A reviewing court "should not defer to an agency position which is contrary to an intent of Congress expressed in unambiguous terms." *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 476, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992).

[¶ 32] Defendants contend that USDA's interpretation of the Act as allowing producer communications is entitled to substantial deference as long as the interpretation is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). The United States Supreme Court has instructed us that

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or

ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (footnotes omitted). The Supreme Court cautions, however, that:

> The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

*Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 n. 9 (internal citations omitted).

> "The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974). If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to· the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

> We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to ad-

minister, and the principle of deference to administrative interpretations.

*Id.* at 843–44, 104 S.Ct. at 2782

[¶ 33] "Although substantial deference is due an agency's interpretation of its regulations, no deference is due if the interpretation is contrary to the regulation's plain meaning. *See Shalala v. St. Paul–Ramsey Med. Ctr.,* 50 F.3d 522, 528 (8th Cir.1995)." *In re Old Fashioned Enterprises, Inc.,* 236 F.3d 422, 425 (8th Cir. 2001). Assuming that the spending for producer communications designed to promote the Board itself and to campaign for the retention of the checkoff program is not in clear violation of the Act or, for that matter, the CFR, under what standard should the Court examine the Board's claim that it has validly spent checkoff funds for such types of producer information? Is such extensive activity "agency action" subject only to the "arbitrary and capricious" test under the APA or is it merely the construction of a statute (which construction was not subject to the publication and comment procedures of the APA) which is subject to the "considerable weight" standard? The Court has found that the offending producer communications are clearly in violation of the Act itself. Assuming, however, that the Court is mistaken in this holding, it is significant here that these issues as to types of producer communications and campaign activities have never been subjected "to the rigors of notice and comment" and, therefore, such determinations are not entitled to substantial deference. *See King v. Morrison,* 231 F.3d 1094, 1097 (8th Cir. 2000) (refusing to defer to an agency program statement). The holding in *King* was cited with approval in *In re Old Fashioned Enterprises, Inc.,* 236 F.3d at 425. *Old Fashioned Enterprises* also cited with approval *United States v. 162 MegaMania Gambling Devices,* 231 F.3d 713, 716 (10th Cir.2000) (court "not obligated to afford [agency's] informal pronouncements the same deference prescribed under *Chevron* "). It may well be that no producer

communications of any kind are permitted by the Act and that this is the clear intent of Congress as shown by the 1985 action in removing from the statute the words "producer communications." Plaintiffs do not ask the Court to reach such question and the Court will therefore not do so. Thus, for the purposes of the request for a preliminary injunction the Court will accept the Board's determination that it is entitled to spend some checkoff funds for producer communications. This Court is the arbiter of whether the communications challenged here fall under the definition of allowable producer communications and the Court finds that the producer communications challenged by plaintiffs are clearly in violation of the Act.

### C. First Amendment

[¶ 34] Assuming the Board had the authority to use checkoff funds for some producer communications, the communications which are challenged here do not constitute permissible producer communications. The United States Supreme Court held in *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209, 235, 97 S.Ct. 1782, 1800, 52 L.Ed.2d 261 (1977), "that a union could not expend a dissenting individual's dues for ideological activities not 'germane' to the purpose for which compelled association was justified: collective bargaining." *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 473, 117 S.Ct. 2130, 2140, 138 L.Ed.2d 585, (1997). That holding was further refined in *Keller v. State Bar of Cal.*, 496 U.S. 1, 14, 110 S.Ct. 2228, 2236, 110 L.Ed.2d 1 (1990), wherein the Supreme Court held that "the guiding standard must be whether the challenged expenditures are necessarily or reasonably incurred for the purpose" for which the compelled association was justified: "improving the quality of the legal service available to the people of the State."

[¶ 35] This case is not governed by the United States Supreme Court's decision in *Wileman*, 521 U.S. at 468–69, 117 S.Ct. at 2138, to the effect that the expenditure of funds only for generic advertising pursuant to a marketing order does not raise a First Amendment issue but is instead "a question of economic policy for Congress and the Executive to resolve." *Wileman* is a very important case but the facts and the issues are different. In *Wileman*, the Supreme Court held that "requiring [California tree fruitgrowers] to pay the assessments" to be used for generic advertising does not constitute prohibited compelled speech because "[n]one of the advertising in this record promotes any particular message other than encouraging consumers to buy California tree fruit." *Wileman*, 521 U.S. at 472, 117 S.Ct. at 2139–40. *Wileman* is not applicable here because the plaintiffs are not challenging generic advertising but instead challenge compelled speech which promotes a particular political position, namely that the beef checkoff should not be repealed and that the referendum should be thwarted. In *Wileman*, the producers did not even allege that their checkoff payments were being used to "endorse or finance any political or ideological views." None of the advertising in *Wileman* conveyed any message with which the producers disagreed. In the case now before me, the producer plaintiffs disagree with and oppose any messages and advertising other than to sell and promote beef and limited producer communications.

[¶ 36] Where compelled association (a State Bar Association, for example) is justified, mandatory dues may be used to fund activities germane to the goals of the association but may not be used to fund "activities of an ideological nature which fall outside" those areas of activity. *Keller v. State Bar of Cal.*, 496 U.S. at 14, 110 S.Ct. at 2236. Attacking the referendum drive, directly or indirectly, however subtle, is an activity of an ideological nature which falls outside the common goals of all cattle producers. The challenged communications are being used, in part, to keep the Board in existence. They constitute a political campaign. Many of the assertions

made by the Board are not measurable. Such activity violates the First Amendment rights of the individual plaintiffs.

[¶ 37] It is of some significance to the Court that USDA's AMS has developed proposed guidelines to promote uniformity in the oversight of national research and promotion programs. These proposed guidelines provide, in part:

Boards, board members, and board employees acting in their official capacities are prohibited from attempting to influence voters, and no board funds may be expended for that purpose. Board funds may not be used to state a position for or against a referendum.

During period (sic) of referenda, requests for referenda, polls, or any petition process, however, board funds may be used: (1) for communication activities to inform industry how checkoff dollars are being spent and (2) to provide unbiased factual information concerning the referendum, poll, or petition process. Board funds may also be used to encourage those covered by a program to exercise their right to vote.

64 Fed.Reg. 70,682, 70,686 (December 17, 1999). To the Court's knowledge, these proposed guidelines have not yet been published or adopted. They are, nonetheless, significant to show that USDA does not interpret the Act as allowing checkoff funds to be spent to provide biased information or opinions concerning referenda, that is, whether the program should be continued, whether it is effective, whether it is working, whether USDA and the Board are "accountable", whether USDA and the Board are "fair", and other similar claims with glowing descriptions.

[¶ 38] The Court rejects the defendants' contention that the negative advertising and anti-referendum activities are not being paid for by the Board but, rather, by the NCBA, a private cattlemen's membership organization, using non-checkoff funds. The Board itself has published anti-referendum information. Further, the Board's link to the NCBA's Web site, under the guise of Board "Newsroom" information, necessarily establishes that the Board is or was conducting anti-referendum producer communications.

## D. The Dataphase Factors

[¶ 39] Since some checkoff funds are being illegally spent, the threat of irreparable harm is great. No records are kept by defendants to determine which producers have paid money to the checkoff and no records exist as to how much has been paid by each producer. It would, therefore, be almost impossible to determine and pay any refunds. Further, it would make no sense to refund ten million dollars possibly illegally spent since the refund moneys would have to come from current checkoff payments, which would therefore not be available for the legitimate purposes intended by Congress. The plaintiffs have worked for 18 months at great expense and trouble to possibly obtain the signatures necessary to trigger a referendum. They would be irreparably harmed by the continued use of checkoff funds to combat their efforts. Plaintiffs have no adequate legal remedy to recover the illegal use of the funds, if that use would be allowed to continue.

[¶ 40] The balance of harms clearly favors the plaintiffs. Defendants have identified no interest in using the checkoff funds for the purpose of opposing the referendum (which they claim they have no intention of doing). Neither have defendants identified any harm in being prevented from using checkoff funds for the purpose of opposing the referendum or for the purpose of promoting the continued existence of the Board and the checkoff itself to producers. USDA has no "vested interest", one way or the other. A preliminary injunction imposes no harm on USDA and very little harm on the Board.

[¶ 41] The Court determines that, for the purposes of applying the *Dataphase* factors, the plaintiffs' likelihood of success on the merits as to the use or abuse of some

of the checkoff money is very probable. It is clear that the Act does not allow for producer communications to the extent which have occurred. As I have discussed, the Act may possibly not allow any producer communications. It is clear that certain producer communications issued by the Board violate the individual plaintiffs' First Amendment rights.

[¶ 42] The public has an interest in executive compliance with the restrictions placed upon an agency by Congress. Referenda have traditionally been one of the checks and balances citizens of this country enjoy. The public has no interest in propaganda, with coerced funds, seeking to prevent or discourage a referendum. The public interest clearly favors plaintiffs.

[¶ 43] The *Dataphase* balance clearly tips in favor of the plaintiffs and they are entitled to a preliminary injunction preventing defendants from using checkoff funds for the purposes of opposing the referendum or perpetuating the existence of the Board.

## IV. PAPERWORK REDUCTION ACT

[¶ 44] The Court turns now to the contention that the defendants have violated the Paperwork Reduction Act. The federal Paperwork Reduction Act was intended to minimize the time, effort, and financial resources expended by individuals and small businesses in complying with federal agency reporting requirements and information gathering activities. Among other things, the Act establishes the Office of Information and Regulatory Affairs (OIRA) within the Office of Management and Budget (OMB), with authority to:

... develop and implement guidelines on information disclosure and confidentiality;

... monitor compliance with the federal Privacy Act;

... review and approve agency information collection request forms;

... determine whether the collection of particular information is necessary;

... establish requirements for agency audits of all major information systems;

... disapprove any request by an agency for the collection of information;

... review, at least once every three years, the information management activities of each agency to ascertain their adequacy and efficiency.

[¶ 45] The Act also requires individual agencies to:

... reduce to the appropriate and practicable extent the burden on persons supplying information to the agency;

... submit to the OIRA each proposed information request form for approval.

[¶ 46] Before approving or disapproving a proposed information collection request from an agency, the OIRA must give interested persons an opportunity to be heard and to submit written statements of their views. It is clear that plaintiffs were "interested persons" and were given no opportunity to comment on anything before USDA hired and guided PWC as they moved to collect information from thousands of people. To the extent that the OIRA determines that the collection of particular information by an agency is unnecessary, the agency cannot engage in collection.

[¶ 47] 44 U.S.C. § 3512 states:

(a) Notwithstanding any other provision of law, no person shall be subject to any penalty for failure to comply with a collection of information that is subject to this [subchapter] [44 U.S.C. §§ 3501 et seq.] if—

(1) the collection of information does not display a valid control number assigned by the Director in accordance with this [subchapter] [44 U.S.C. §§ 3501 et seq.]; or

(2) the agency fails to inform the person who is to respond to the collection of information that such person is not required to respond to the collection of information unless it displays a valid control number.

(b) The protection provided by this section may be raised in the form of a complete defense, bar, or otherwise at any time during the agency administrative process or judicial action applicable thereto.

[¶ 48] The Paperwork Reduction Act makes it clear that no person may be subjected to any penalty for failure to maintain or provide information unless the collection request form contains a current OIRA control number, or states that the person is not required to respond.

[¶ 49] Plaintiffs allege, among other things, that the Secretary has failed to comply with the requirements of the Paperwork Reduction Act of 1995. In the Secretary's possible decision to validate (or invalidate) the signatures of those who signed the various petitions, the Secretary employed PWC to track the validity of the signatures and ensure that each signer was a producer. Ten months had elapsed between the time the signatures were turned over to USDA and the date the Secretary actually began to look at them. PWC was employed to attempt to obtain certain information from each of the signers to verify their status. When PWC sent out the survey forms, the defendants had not obtained permission from the Office of Management and Budget, as required by the Paperwork Reduction Act. The defendants completely ignored the law. The statute specifically states that "no person is subject to *any*" penalty. Refusing to allow a referendum based upon various alleged signers not completing the survey sent out by PWC may be a penalty. The position of the defendants is that the Paperwork Reduction Act is not being violated because they are not invalidating any signatures based upon the fact that the informants did not return the surveys. PWC, however, invalidated 9.2% of the total signatures because the person who answered the telephone stated he or she did not know whether he or she had signed the petition. PWC invalidated 0.8% of signatures from persons who refused to answer any questions during the telephone survey. There are a number of factual determinations to be made following the next hearing.

[¶ 50] As already noted, the defendants provided no opportunity for plaintiffs and other "interested persons" to comment on the proposed survey and paperwork. The legal effect of this failure need not be resolved at this time. The defendants obviously submitted nothing to the OIRA although they had at least ten months to do so after the referendum petitions were submitted. This was a clear violation of a federal law intended for the protection of the public. Questions remain as to the legal consequences of such violations. This Court recognizes the holding in *Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826, 844 (9th Cir. 1999), to the effect that there is no private right of action under the Paperwork Reduction Act. I respectfully disagree with that holding. The Act clearly provides that the protective section may be raised in the form of a "complete defense, or bar or otherwise at any time during the agency administrative process of judicial action applicable thereto." (emphasis supplied) I cannot imagine language that would be more expansive. Decisions as to the legal consequences of these violations will be made following the next hearing in this case.

[¶ 51] The Court posed questions to counsel at the hearing conducted. Some of the questions concerned the decisions made about the referendum petitions. USDA apparently decided that signatures would be invalidated if the signer had not also printed his or her name next to the signature (regardless of whether the signature was legible). Signatures were invalidated for a number of other reasons, including no street address, no zip code, and no year of signing. Signers in rural areas may have no street addresses. The process of looking at these issues, as already noted, is greatly complicated by the fact that USDA has no regulations or rules regarding ref-

erendum petitions or how to validate or invalidate signatures or petitions. USDA has no referenda rules, even after the extensive legal battles in connection with the referendum on the pork checkoff (which battles continue to this day). Again, as already discussed, little deference would apparently be due to an agency acting with no guidelines or rules. The agency apparently had nothing to interpret.

## ORDER

[¶ 52] Based upon the foregoing, until further Order of the court,

[¶ 53] IT IS ORDERED, as follows:

1. The plaintiffs' motions (Docs. 3 and 16) for a preliminary injunction are granted, in part, to the extent plaintiffs seek injunctive relief relating to the expenditure of checkoff funds. The court reserves ruling on those portions of the motions for a preliminary injunction concerning the PWC process of validating or invalidating signatures on the referendum petitions or cards and the question of scheduling or not scheduling a beef checkoff referendum.

2. Defendants and those described in Fed.R.Civ.P. § 65(d) are preliminarily enjoined from any further use of assessments collected pursuant to the Beef Promotion and Research Act, 7 U.S.C. §§ 2901–11, or the Beef Promotion and Research Order 7 C.F.R. Part 1260, to create or distribute any material, whether written, oral or audio-visual, for the purpose of influencing governmental action or policy with regard to the beef checkoff or the Board or both.

3. Defendants and those described in Fed.R.Civ.P. § 65(d) are preliminarily enjoined from any further use of assessments collected pursuant to the Beef Promotion and Research Act, 7 U.S.C. §§ 2901–11, or the Beef Promotion and Research Order 7 C.F.R. Part 1260, to create or distribute any material, whether written, oral or audio-visual, for the purpose of blocking or discouraging a referendum or for the purpose of influencing beef producers to keep the Board or the checkoff program or both in existence.

4. Defendants and those described in Fed.R.Civ.P. § 65(d) are preliminarily enjoined from any further use of assessments collected pursuant to the Beef Promotion and Research Act, 7 U.S.C. §§ 2901–11, or the Beef Promotion and Research Order 7 C.F.R. Part 1260, to create or distribute any material, whether written, oral or audio-visual, for the purpose of lauding the merits of the checkoff program, unless the information can be substantiated mathematically or by resort to documentary evidence which is clear and not subject to reasonable argument. Defendants are specifically enjoined, when using checkoff funds and referring to the checkoff program or the Board or both, from using descriptive words or phrases such as "fair", "accountable", "effective", "it's working", and the like.

5. This Order does not affect the rights of the defendants or anyone coming within the terms of Fed.R.Civ.P. § 65(d) to continue, as they have been doing, to promote and fund research to promote the consumption of beef.

6. This Order does not affect the rights of the defendants or anyone coming within the terms of Fed.R.Civ.P. § 65(d) to continue, as they have been doing, to promote and advertise beef products and the consumption of beef.

7. This Order does not affect the rights of the defendants or anyone coming within the terms of Fed.R.Civ.P. § 65(d) to exercise their First Amendment rights in their personal capacities or with the use of their own funds to promote the Board and the checkoff program or to oppose the referendum.

8. The court having found that plaintiffs cannot practically or reasonably be compensated for the past unlawful activities of the defendants, no bond shall be required which bond would otherwise be required by Fed.R.Civ.P. § 65(c). In addition, no bond is appropriate since the in-

junction as to the use of checkoff funds will, in all probability, become a permanent injunction, unless stayed by higher authority.

9. This Order does not require defendants to breach any contract in existence prior to January 25, 2001, but the defendants shall exercise due diligence and good faith to convert any planned promotion or advertising campaigns from the activities prohibited by this preliminary injunction to activities to simply promote the consumption of beef.