JOHANNS, SECRETARY OF AGRICULTURE, ET AL. *v.*
LIVESTOCK MARKETING ASSOCIATION ET AL.

No. 03–1164.   Argued December 8, 2004—Decided May 23, 2005*

---

*Together with No. 03–1165, *Nebraska Cattlemen, Inc., et al.* v. *Livestock Marketing Association et al.*, also on certiorari to the same court.

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, THOMAS, and BREYER, JJ., joined. THOMAS, J., *post,* p. 567, and BREYER, J., *post,* p. 569, filed concurring opinions. GINSBURG, J., filed an opinion concurring in the judgment, *post,* p. 569. KENNEDY, J., filed a dissenting opinion, *post,* p. 570. SOUTER, J., filed a dissenting opinion, in which STEVENS and KENNEDY, JJ., joined, *post,* p. 570.

*Deputy Solicitor General Kneedler* argued the cause for the federal petitioners in No. 03–1164. With him on the briefs in both cases were *Acting Solicitor General Clement,*

Assistant Attorney General Keisler, Irving L. Gornstein, Douglas N. Letter, and Matthew M. Collette.

Gregory G. Garre argued the cause for petitioners in No. 03–1165. With him on the briefs was Lorane F. Hebert.

Laurence H. Tribe argued the cause for respondents in both cases. With him on the brief were Thomas Goldstein, Amy Howe, Philip Olsson, Ronald A. Parsons, Jr., and Scott N. Heidepriem.†

---

†Briefs of amici curiae urging reversal in both cases were filed for the State of California by Bill Lockyer, Attorney General of California, Richard M. Frank, Chief Deputy Attorney General, Mary E. Hackenbracht, Senior Assistant Attorney General, and Linda L. Berg, Deputy Attorney General; for the State of Texas et al. by Greg Abbott, Attorney General of Texas, R. Ted Cruz, Solicitor General, Rance L. Craft, Assistant Solicitor General, Barry R. McBee, First Assistant Attorney General, and Edward D. Burbach, Deputy Attorney General, by William Vázquez Irizarry, Secretary of Justice of Puerto Rico, and by the Attorneys General for their respective States as follows: Troy King of Alabama, Terry Goddard of Arizona, Mike Beebe of Arkansas, Ken Salazar of Colorado, M. Jane Brady of Delaware, Charles J. Crist, Jr., of Florida, Thurbert E. Baker of Georgia, Mark J. Bennett of Hawaii, Lawrence G. Wasden of Idaho, Lisa Madigan of Illinois, Thomas J. Miller of Iowa, Gregory D. Stumbo of Kentucky, Charles C. Foti, Jr., of Louisiana, J. Joseph Curran, Jr., of Maryland, Michael A. Cox of Michigan, Jim Hood of Mississippi, Jeremiah W. (Jay) Nixon of Missouri, Jon Bruning of Nebraska, Patricia A. Madrid of New Mexico, Wayne Stenehjem of North Dakota, Jim Petro of Ohio, W. A. Drew Edmondson of Oklahoma, Hardy Myers of Oregon, Gerald J. Pappert of Pennsylvania, Henry McMaster of South Carolina, Paul G. Summers of Tennessee, Mark L. Shurtleff of Utah, William H. Sorrell of Vermont, Jerry W. Kilgore of Virginia, Christine O. Gregoire of Washington, Peggy A. Lautenschlager of Wisconsin, and Patrick J. Crank of Wyoming; for the American Cotton Shippers Association et al. by Walter Dellinger and Pamela Harris; for the California Agricultural Issues Forum by Seth P. Waxman, Randolph D. Moss, Todd Zubler, and Brian M. Boynton; for the Michigan Pork Producers Association, Inc., et al. by Edward M. Mansfield; for Thad Cochran et al. by David A. Bono and Gerald P. Norton; and for 113 Agricultural Industry Associations by Charles L. Babcock and David T. Moran.

Briefs of amici curiae urging affirmance in both cases were filed for the Campaign for Family Farms et al. by Susan E. Stokes, David R. Moeller,

JUSTICE SCALIA delivered the opinion of the Court.

For the third time in eight years, we consider whether a federal program that finances generic advertising to promote an agricultural product violates the First Amendment. In these cases, unlike the previous two, the dispositive question is whether the generic advertising at issue is the Government's own speech and therefore is exempt from First Amendment scrutiny.

## I

## A

The Beef Promotion and Research Act of 1985 (Beef Act or Act), 99 Stat. 1597, announces a federal policy of promoting the marketing and consumption of "beef and beef products," using funds raised by an assessment on cattle sales and importation. 7 U. S. C. § 2901(b). The statute directs the Secretary of Agriculture to implement this policy by issuing a Beef Promotion and Research Order (Beef Order or Order), § 2903, and specifies four key terms it must contain: The Secretary is to appoint a Cattlemen's Beef Promotion and Research Board (Beef Board or Board), whose members are to be a geographically representative group of beef producers and importers, nominated by trade associations. § 2904(1). The Beef Board is to convene an Operating Committee, composed of 10 Beef Board members and 10 repre-

and *Karen R. Krub;* for the Coalition of Cotton Apparel Importers by *Carter G. Phillips, Alan Charles Raul, Eric A. Shumsky,* and *Michael C. Soules;* for the DKT Liberty Project et al. by *Julie M. Carpenter, Daniel Mach,* and *Robert M. O'Neil;* for Public Citizen, Inc., by *Scott L. Nelson;* for Rose Acre Farms, Inc., by *Corinne R. Finnerty* and *Loren D. Reuter;* for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *Richard A. Samp;* for Jeanne Charter et al. by *Erik S. Jaffe, Brian C. Leighton, James A. Moody, Steven B. Gold, Renee Giachino, Michael P. McMahon,* and *Virginia B. Townes;* and for Joseph Cochran et al. by *William H. Mellor, Steven M. Simpson,* and *Scott G. Bullock.*

*Barry Richard, Hank B. Campbell,* and *Monterey Campbell* filed a brief in both cases for the State of Florida, Department of Citrus, as *amicus curiae.*

sentatives named by a federation of state beef councils. § 2904(4)(A). The Secretary is to impose a $1-per-head assessment (or "checkoff") on all sales or importation of cattle and a comparable assessment on imported beef products. § 2904(8). And the assessment is to be used to fund beef-related projects, including promotional campaigns, designed by the Operating Committee and approved by the Secretary. §§ 2904(4)(B), (C).

The Secretary promulgated the Beef Order with the specified terms. The assessment is collected primarily by state beef councils, which then forward the proceeds to the Beef Board. 7 CFR § 1260.172(a)(5) (2004).[1] The Operating Committee proposes projects to be funded by the checkoff including promotion and research. § 1260.167(a). The Secretary or his designee (see §§ 2.22(a)(1)(viii)(X), 2.79(a)(8)(xxxii)) approves each project and, in the case of promotional materials, the content of each communication. §§ 1260.168(e), 1260.169; App. 114, 143.

The Beef Order was promulgated in 1986 on a temporary basis, subject to a referendum among beef producers on whether to make it permanent. 7 U. S. C. §§ 2903, 2906(a). In May 1988, a large majority voted to continue it. Since that time, more than $1 billion has been collected through the checkoff, 132 F. Supp. 2d 817, 820 (SD 2001), and a large fraction of that sum has been spent on promotional projects authorized by the Beef Act—many using the familiar trademarked slogan "Beef. It's What's for Dinner." App. 50. In fiscal year 2000, for example, the Beef Board collected over $48 million in assessments and spent over $29 million on domestic promotion. The Board also funds overseas marketing efforts; market and food-science research, such as evaluations of the nutritional value of beef; and informa-

---

[1] In most cases, only 50 cents per head is remitted to the Beef Board, because the Beef Act and Beef Order allow domestic producers to deduct from their $1 assessment up to 50 cents in voluntary contributions to their state beef councils. 7 U. S. C. § 2904(8)(C); 7 CFR § 1260.172(a)(3) (2004).

tional campaigns for both consumers and beef producers. See 7 U. S. C. §§ 2902(6), (9), (15), 2904(4)(B).

Many promotional messages funded by the checkoff (though not all, see App. 52–53) bear the attribution "Funded by America's Beef Producers." *E. g., id.,* at 50–51. Most print and television messages also bear a Beef Board logo, usually a checkmark with the word "BEEF." *E. g., id.,* at 50–52.

## B

Respondents are two associations whose members collect and pay the checkoff, and several individuals who raise and sell cattle subject to the checkoff. *Id.,* at 17–19. They sued the Secretary, the Department of Agriculture, and the Board in Federal District Court on a number of constitutional and statutory grounds not before us—in particular, that the Board impermissibly used checkoff funds to send communications supportive of the beef program to beef producers. 132 F. Supp. 2d, at 823. Petitioners in No. 03–1165, a state beef producers' association and two individual producers, intervened as defendants to argue in support of the program. The District Court granted a limited preliminary injunction, which forbade the continued use of checkoff funds to laud the beef program or to lobby for governmental action relating to the checkoff. *Id.,* at 832.

While the litigation was pending, we held in *United States v. United Foods, Inc.,* 533 U. S. 405 (2001), that a mandatory checkoff for generic mushroom advertising violated the First Amendment. Noting that the mushroom program closely resembles the beef program,[2] respondents amended their

---

[2] The Department of Agriculture oversees similar programs of promotional advertising, funded by checkoffs, for a number of other agricultural commodities. See 7 CFR § 1205.10 *et seq.* (2004) (cotton); § 1207.301 *et seq.* (potatoes); § 1210.301 *et seq.* (watermelons); § 1215.1 *et seq.* (popcorn); § 1216.1 *et seq.* (peanuts); § 1218.1 *et seq.* (blueberries); § 1219.1 *et seq.* (Hass avocados); § 1220.101 *et seq.* (soybeans); § 1230.1 *et seq.* (pork); § 1240.1 *et seq.* (honey); § 1250.301 *et seq.* (eggs); § 1280.101 *et seq.* (lamb).

complaint to assert a First Amendment challenge to the use of the beef checkoff for promotional activity. 207 F. Supp. 2d 992, 996 (SD 2002); App. 30–32. Respondents noted that the advertising promotes beef as a generic commodity, which, they contended, impedes their efforts to promote the superiority of, *inter alia,* American beef, grain-fed beef, or certified Angus or Hereford beef.

After a bench trial, the District Court ruled for respondents on their First Amendment claim. It declared that the Beef Act and Beef Order unconstitutionally compel respondents to subsidize speech to which they object, and rejected the Government's contention that the checkoff survives First Amendment scrutiny because it funds only government speech. 207 F. Supp. 2d, at 1002–1007. The court entered a permanent injunction barring any further collection of the beef checkoff, even from producers willing to pay (allowing continued collection of voluntary checkoffs, the court thought, would require "rewrit[ing]" the Beef Act). *Id.,* at 1007–1008. Believing that the cost of calculating the share of the checkoff attributable to the compelled subsidy would be too great, the court also declined to order a refund of checkoff funds already collected. *Ibid.* Finally, the court made permanent its earlier injunction against "producer communications" praising the beef program or seeking to influence governmental policy. *Id.,* at 1008. The court did not rule on respondents' other claims, but certified its resolution of the First Amendment claim as final pursuant to Federal Rule of Civil Procedure 54(b). 207 F. Supp. 2d, at 1008.

The Court of Appeals for the Eighth Circuit affirmed. 335 F. 3d 711 (2003). Unlike the District Court, the Court of Appeals did not dispute that the challenged advertising is government speech; instead, it held that government speech status is relevant only to First Amendment challenges to the speech's *content,* not to challenges to its compelled *funding.* See *id.,* at 720–721. Compelled funding of speech, it held,

may violate the First Amendment even if the speech in ques-tion is the government's. *Ibid.*

We granted certiorari. 541 U. S. 1062 (2004).

## II

We have sustained First Amendment challenges to alleg-edly compelled expression in two categories of cases: true "compelled-speech" cases, in which an individual is obliged personally to express a message he disagrees with, imposed by the government; and "compelled-subsidy" cases, in which an individual is required by the government to subsidize a message he disagrees with, expressed by a private entity. We have not heretofore considered the First Amendment consequences of government-compelled subsidy of the gov-ernment's own speech.

We first invalidated an outright compulsion of speech in *West Virginia Bd. of Ed.* v. *Barnette,* 319 U. S. 624 (1943). The State required every schoolchild to recite the Pledge of Allegiance while saluting the American flag, on pain of expulsion from the public schools. We held that the First Amendment does not "le[ave] it open to public authorities to compel [a person] to utter" a message with which he does not agree. *Id.,* at 634. Likewise, in *Wooley* v. *Maynard,* 430 U. S. 705 (1977), we held that requiring a New Hamp-shire couple to bear the State's motto, "Live Free or Die," on their cars' license plates was an impermissible compul-sion of expression. Obliging people to "use their private property as a 'mobile billboard' for the State's ideological message" amounted to impermissible compelled expression. *Id.,* at 715.

The reasoning of these compelled-speech cases has been carried over to certain instances in which individuals are compelled not to speak, but to subsidize a private message with which they disagree. Thus, although we have upheld state-imposed requirements that lawyers be members of the state bar and pay its annual dues, and that public school

teachers either join the labor union representing their "shop" or pay "service fees" equal to the union dues, we have invalidated the use of the compulsory fees to fund speech on political matters. See *Keller* v. *State Bar of Cal.*, 496 U. S. 1 (1990); *Abood* v. *Detroit Bd. of Ed.*, 431 U. S. 209 (1977). Bar or union speech with such content, we held, was not germane to the regulatory interests that justified compelled membership, and accordingly, making those who disagreed with it pay for it violated the First Amendment. See *Keller, supra,* at 15–16; *Abood, supra,* at 234–235.

These latter cases led us to sustain a compelled-subsidy challenge to an assessment very similar to the beef checkoff, imposed to fund mushroom advertising. *United Foods, supra;* see 335 F. 3d, at 717 ("[W]e agree with the district court that '[t]he beef checkoff is, in all material respects, identical to the mushroom checkoff'" at issue in *United Foods*). Deciding the case on the assumption that the advertising was private speech, not government speech, see 533 U. S., at 416–417,[3] we concluded that *Abood* and *Keller* were controlling. As in those cases, mushroom producers were obliged by "law or necessity" to pay the checkoff; although *Abood* and *Keller* would permit the mandatory fee if it were "germane" to a "broader regulatory scheme," in

---

[3] In *United Foods,* the Court distinguished (and the dissent relied on) *Glickman* v. *Wileman Brothers & Elliott, Inc.*, 521 U. S. 457 (1997), which upheld the use of mandatory assessments to fund generic advertising promoting California tree fruit. In *Glickman,* as in *United Foods,* the Government did not argue that the advertising was permissible government speech. See 521 U. S., at 482, n. 2 (SOUTER, J., dissenting) (noting that the Government had waived any such argument). Rather, the Government contended, and we agreed, that compelled support for generic advertising was legitimately part of the Government's "collectivist" centralization of the market for tree fruit. *Id.,* at 475 (opinion of the Court). Here, as in *United Foods,* "there is no broader regulatory system in place" that collectivizes aspects of the beef market unrelated to speech, so *Glickman* is not controlling. 533 U. S., at 415.

*United Foods* the only regulatory purpose was the funding of the advertising. 533 U. S., at 413, 415–416.

In all of the cases invalidating exactions to subsidize speech, the speech was, or was presumed to be, that of an entity other than the government itself. See *Keller, supra,* at 11, 15–16; *Abood, supra,* at 212–213; *United Foods, supra,* at 416–417; see also *Board of Regents of Univ. of Wis. System* v. *Southworth,* 529 U. S. 217, 229, 230 (2000) (because "[t]he University ha[s] disclaimed that the speech is its own," *Abood* and *Keller* "provide the beginning point for our analysis"); cf. *Rosenberger* v. *Rector and Visitors of Univ. of Va.,* 515 U. S. 819, 851–852 (1995) (O'CONNOR, J., concurring) (university's Student Activities Fund likely does not unconstitutionally compel speech because it "represents not government resources . . . but a fund that simply belongs to the students"). Our compelled-subsidy cases have consistently respected the principle that "[c]ompelled support of a private association is fundamentally different from compelled support of government." *Abood, supra,* at 259, n. 13 (Powell, J., concurring in judgment). "Compelled support of government"—even those programs of government one does not approve—is of course perfectly constitutional, as every taxpayer must attest. And some government programs involve, or entirely consist of, advocating a position. "The government, as a general rule, may support valid programs and policies by taxes or other exactions binding on protesting parties. Within this broader principle it seems inevitable that funds raised by the government will be spent for speech and other expression to advocate and defend its own policies." *Southworth,* 529 U. S., at 229. We have generally assumed, though not yet squarely held, that compelled funding of government speech does not alone raise First Amendment concerns. See *ibid.; Keller, supra,* at 12–13; *Rosenberger, supra,* at 833; see also *Wooley, supra,* at 721 (REHNQUIST, J., dissenting).

## III

Respondents do not seriously dispute these principles, nor do they contend that, as a general matter, their First Amendment challenge requires them to show only that their checkoff dollars pay for speech with which they disagree. Rather, they assert that the challenged promotional campaigns differ dispositively from the type of government speech that, our cases suggest, is not susceptible to First Amendment challenge. They point to the role of the Beef Board and its Operating Committee in designing the promotional campaigns, and to the use of a mandatory assessment on beef producers to fund the advertising. We consider each in turn.

### A

The Secretary of Agriculture does not write ad copy himself. Rather, the Beef Board's promotional campaigns are designed by the Beef Board's Operating Committee, only half of whose members are Beef Board members appointed by the Secretary. (All members of the Operating Committee are subject to *removal* by the Secretary. 7 CFR § 1260.213 (2004).) Respondents contend that speech whose content is effectively controlled by a nongovernmental entity—the Operating Committee—cannot be considered "government speech." We need not address this contention, because we reject its premise: The message of the promotional campaigns is effectively controlled by the Federal Government itself.[4]

The message set out in the beef promotions is from beginning to end the message established by the Federal Gov-

---

[4] We therefore need not label the Operating Committee as "governmental" or "nongovernmental." The entity to which assessments are remitted is the Beef Board, all of whose members are appointed by the Secretary pursuant to law. The Operating Committee's only relevant involvement is ancillary—it designs the promotional campaigns, which the Secretary supervises and approves—and its status as a state actor thus is not directly at issue.

ernment.[5]    Congress has directed the implementation of a "coordinated program" of promotion, "including paid advertising, to advance the image and desirability of beef and beef products."   7  U. S. C.  §§ 2901(b),  2902(13).   Congress and the Secretary have also specified, in general terms, what the promotional campaigns shall contain, see, *e. g.,* § 2904(4)(B)(i) (campaigns "shall . . . take into account" different types of beef products), and what they shall not, see, *e. g.,* 7 CFR § 1260.169(d) (2004) (campaigns shall not, without prior approval, refer "to a brand or trade name of any beef product"). Thus, Congress and the Secretary have set out the overarching message and some of its elements, and they have left the development of the remaining details to an entity whose members are answerable to the Secretary (and in some cases appointed by him as well).

Moreover, the record demonstrates that the Secretary exercises final approval authority over every word used in every promotional campaign.   All proposed promotional messages are reviewed by Department officials both for substance and for wording, and some proposals are rejected or rewritten by the Department.    App. 114, 118–121, 274–275. Nor is the Secretary's role limited to final approval or rejection: Officials of the Department also attend and participate in the open meetings at which proposals are developed.    *Id.,* at 111–112.

This degree of governmental control over the message funded by the checkoff distinguishes these cases from *Keller.*

---

[5] The principal dissent suggests that if this is so, then the Government has adopted at best a mixed message, because it also promulgates dietary guidelines that, if followed, would discourage excessive consumption of beef.    *Post,* at 577, n. 5 (opinion of SOUTER, J.); see also *post,* at 569–570 (GINSBURG, J., concurring in judgment).    Even if we agreed that the protection of the government-speech doctrine must be forfeited whenever there is inconsistency in the message, we would nonetheless accord the protection here.    The beef promotions are perfectly compatible with the guidelines' message of moderate consumption—the ads do not insist that beef is also What's for Breakfast, Lunch, and Midnight Snack.

There the state bar's communicative activities to which the plaintiffs objected were not prescribed by law in their general outline and not developed under official government supervision. Indeed, many of them consisted of lobbying the state legislature on various issues. See 496 U. S., at 5, and n. 2. When, as here, the government sets the overall message to be communicated and approves every word that is disseminated, it is not precluded from relying on the government-speech doctrine merely because it solicits assistance from nongovernmental sources in developing specific messages.

## B

Respondents also contend that the beef program does not qualify as "government speech" because it is funded by a targeted assessment on beef producers, rather than by general revenues. This funding mechanism, they argue, has two relevant effects: It gives control over the beef program not to politically accountable legislators, but to a narrow interest group that will pay no heed to respondents' dissenting views, and it creates the perception that the advertisements speak for beef producers such as respondents.

We reject the first point. The compelled-*subsidy* analysis is altogether unaffected by whether the funds for the promotions are raised by general taxes or through a targeted assessment. Citizens may challenge compelled support of private speech, but have no First Amendment right not to fund government speech. And that is no less true when the funding is achieved through targeted assessments devoted exclusively to the program to which the assessed citizens object. Cf. *United States* v. *Lee*, 455 U. S. 252, 260 (1982) ("There is no principled way . . . to distinguish between general taxes and those imposed under the Social Security Act" in evaluating the burden on the right to free exercise of religion). The First Amendment does not confer a right to pay one's taxes

into the general fund, because the injury of compelled funding (as opposed to the injury of compelled speech) does not stem from the Government's mode of accounting. Cf. *Bowen* v. *Roy*, 476 U. S. 693, 700 (1986) ("The Free Exercise Clause . . . does not afford an individual a right to dictate the conduct of the Government's internal procedures"); *id.*, at 716–717 (STEVENS, J., concurring in part and concurring in result).

Some of our cases have justified compelled funding of government speech by pointing out that government speech is subject to democratic accountability. See, *e. g., Abood,* 431 U. S., at 259, n. 13 (Powell, J., concurring in judgment); *Southworth,* 529 U. S., at 235. But our references to "traditional political controls," *id.,* at 229, do not signify that the First Amendment duplicates the Appropriations Clause, U. S. Const., Art. I, § 9, cl. 7, or that every instance of government speech must be funded by a line item in an appropriations bill. Here, the beef advertisements are subject to political safeguards more than adequate to set them apart from private messages. The program is authorized and the basic message prescribed by federal statute, and specific requirements for the promotions' content are imposed by federal regulations promulgated after notice and comment. The Secretary of Agriculture, a politically accountable official, oversees the program, appoints and dismisses the key personnel, and retains absolute veto power over the advertisements' content, right down to the wording.[6] And Congress, of course, retains oversight authority, not to mention

---

[6] Congress also required a referendum among producers before permanently implementing the checkoff, and allowed the Secretary to call another referendum upon demand of a "representative group" comprising 10 percent of cattle producers. 7 U. S. C. §§ 2906(a)–(b). Even before they amended their complaint to challenge the checkoff as compelled speech, respondents were seeking in this litigation to force such a referendum. See 207 F. Supp. 2d 992, 995 (SD 2002).

the ability to reform the program at any time. No more is required.[7]

As to the second point, respondents' argument proceeds as follows: They contend that crediting the advertising to "America's Beef Producers" impermissibly uses not only their money but also their seeming endorsement to promote a message with which they do not agree. Communications cannot be "government speech," they argue, if they are attributed to someone other than the government; and the person to whom they are attributed, when he is, by compulsory funding, made the unwilling instrument of communication, may raise a First Amendment objection.

We need not determine the validity of this argument—which relates to compelled *speech* rather than compelled

---

[7] The principal dissent finds some "First Amendment affront" in all compelled funding of government speech—and when, it says, "a targeted assessment . . . makes the First Amendment affront more galling, . . . greater care is required to ensure that the political process can practically respond to limit the compulsion." *Post*, at 576. That greater care consists, the dissent says, of a requirement that government speech funded by a targeted assessment must identify government as the speaker. *Post*, at 576–578. The dissent cites no prior practice, no precedent, and no authority for this highly refined elaboration—not even anyone who has ever before thought of it. It is more than we think can be found within "Congress shall make no law . . . abridging the freedom of speech." Of course, nothing in the Beef Act or Beef Order prevents the Government from identifying itself as sponsor of the ads—much less requires *concealment* of the ads' provenance—so even if it were correct, this theory would not sustain the judgment below, which altogether enjoined the Act and the Order. But the correct focus is not on whether the ads' audience realizes the Government is speaking, but on the compelled assessment's purported interference with respondents' First Amendment rights. As we hold today, respondents enjoy no right not to fund government speech—whether by broad-based taxes or targeted assessments, and whether or not the reasonable viewer would identify the speech as the government's. If a viewer would identify the speech as *respondents'*, however, the analysis would be different. See *infra* this page and 565–567, and n. 8.

*subsidy* [8]—with regard to respondents' facial challenge. Since neither the Beef Act nor the Beef Order *requires* attribution, neither can be the cause of any possible First Amendment harm. The District Court's order enjoining the enforcement of the Act and the Order thus cannot be sustained on this theory.

On some set of facts, this second theory might (again, we express no view on the point) form the basis for an as-applied challenge—if it were established, that is, that individual beef advertisements were attributed to respondents. The record, however, includes only a stipulated sampling of these promotional materials, see App. 47, and none of the exemplars provides any support for this attribution theory except for the tagline identifying the funding. Respondents apparently presented no other evidence of attribution at trial, and the District Court made no factual findings on the point. Indeed, in the only trial testimony on the subject that any party has identified, an employee of one of the respondent associations said he did *not* think the beef promotions would

---

[8] The principal dissent conflates the two concepts into something it describes as citizens' "presumptive autonomy as speakers to decide what to say and what to pay for others to say." *Post,* at 576. As we discuss in the text, there might be a valid objection if "those singled out to pay the tax are closely linked with the expression" (*post,* at 575–576) in a way that makes them appear to endorse the government message. But this compelled-speech argument (like the *Wooley* and *Barnette* opinions on which it draws) differs substantively from the compelled-subsidy analysis. The latter invalidates an exaction not because being forced to pay for speech that is unattributed violates personal autonomy, but because being forced to fund someone else's private speech unconnected to any legitimate government purpose violates personal autonomy. *Supra,* at 557–558 (discussing *Keller* and *Abood*). Such a violation does not occur when the exaction funds government speech. Apportioning the burden of funding government operations (including speech) through taxes and other levies does not violate autonomy simply because individual taxpayers feel "singled out" or find the exaction "galling," *post,* at 575–576, and n. 4.

be attributed to his group.[9] Whether the *individual* respondents who are beef producers would be associated with speech labeled as coming from "America's Beef Producers" is a question on which the trial record is altogether silent. We have only the funding tagline itself, a trademarked term[10] that, standing alone, is not sufficiently specific to convince a reasonable factfinder that any particular beef producer, or all beef producers, would be tarred with the content of each trademarked ad.[11] We therefore conclude that

---

[9] An employee of respondent Western Organization of Resource Councils (WORC) testified as follows:

"Q When someone would see an ad that says, 'Beef, it's what's for dinner,' do you believe anyone looks at that ad and says that message is coming from WORC?

"A I don't think so.

"Q . . . [D]o you have any basis to actually believe that any of these messages promoted by the Cattlemen's Beef Board are attributed to WORC as an organization?

"A No, I don't think so." Tr. 46–47 (Jan. 14, 2002).

[10] The phrase "America's Beef Producers" has apparently been trademarked by the Board since 1999, see http://tarr.uspto.gov/servlet/tarr?regser=registration&entry=2352917 (as visited May 20, 2005, and available in Clerk of Court's case file), and some promotional materials are attributed to "America's Beef Producers[SM]." Other promotional materials in the record, however, bear other attributions (such as a notice identifying the Beef Board as the copyright holder, or the apparently untrademarked phrase "Funded by America's Veal Producers through the Beef Checkoff"). App. 52.

[11] "America's Beef Producers" might be thought more plausibly to refer to a particular organization of beef producers, and such an organization might have a valid First Amendment objection if the ads' message were incorrectly attributed to it. Cf. *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557, 572–573 (1995). But neither of the respondent groups claims that it would be mistaken for "America's Beef Producers," see n. 9, *supra*, and none of the individual respondents claims to be injured because of his membership in an organization. Rather, respondents claim that "America's Beef Producers" is precise enough to identify the speech as coming from Robert Thullner, John Smith, Ernie Mertz, and the other respondents who are American beef producers.

on the record before us an as-applied First Amendment challenge to the individual advertisements affords no basis on which to sustain the Eighth Circuit's judgment, even in part.

\*　　\*　　\*

Respondents' complaint asserted a number of other grounds for declaring the Beef Act, the Beef Order, or both invalid in their entirety. The District Court, having enjoined the Act and the Order on the basis of the First Amendment, had no occasion to address these other grounds. Respondents may now proceed on these other claims.

The judgment of the Court of Appeals is vacated, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE THOMAS, concurring.

I join the Court's opinion. I continue to believe that "[a]ny regulation that compels the funding of advertising must be subjected to the most stringent First Amendment scrutiny." *United States* v. *United Foods, Inc.*, 533 U. S. 405, 419 (2001) (THOMAS, J., concurring); see also *Glickman* v. *Wileman Brothers & Elliott, Inc.*, 521 U. S. 457, 504–506 (1997) (THOMAS, J., dissenting). At the same time, I recognize that this principle must be qualified where the regulation compels the funding of speech that is the government's own. It cannot be that all taxpayers have a First Amendment objection to taxpayer-funded government speech, even if the funded speech is not "germane" to some broader regulatory program. See *ante,* at 557–559. Like the Court, I see no analytical distinction between "pure" government speech funded from general tax revenues and speech funded from targeted exactions, *ante,* at 562–564; the practice of using targeted taxes to fund government operations, such as excise taxes, dates from the founding, see The Federalist No. 12, p. 75 (J. Cooke ed. 1961).

Still, if the advertisements associated their generic pro-beef message with either the individual or organization respondents, then respondents would have a valid as-applied First Amendment challenge. The government may not, consistent with the First Amendment, associate individuals or organizations involuntarily with speech by attributing an unwanted message to them, whether or not those individuals fund the speech, and whether or not the message is under the government's control. This principle follows not only from our cases establishing that the government may not compel individuals to convey messages with which they disagree, see, *e. g., West Virginia Bd. of Ed.* v. *Barnette,* 319 U. S. 624, 633–634 (1943); *Wooley* v. *Maynard,* 430 U. S. 705, 713–717 (1977), but also from our expressive-association cases, which prohibit the government from coercively associating individuals or groups with unwanted messages, see, *e. g., Boy Scouts of America* v. *Dale,* 530 U. S. 640, 653 (2000) (government cannot "force [an] organization to send a message" with which it disagrees); *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.,* 515 U. S. 557, 576–577 (1995). If West Virginia had compelled Mr. Barnette to take out an advertisement reciting the Pledge of Allegiance and purporting to be "A Message from the Barnette Children," for example, that would have been compelled speech (if a less intrusive form of it), just like the mandatory flag salute invalidated in *Barnette.* The present record, however, does not show that the advertisements objectively associate their message with any individual respondent. *Ante,* at 564–567, and n. 11.* The targeted nature of the funding is also too attenuated a link.

Moreover, these are not cases like *Barnette;* the Government has not forced respondents to bear a government-imposed message. Cf. *ante,* at 565, n. 8; *post,* at 579, n. 9 (SOUTER, J., dissenting). The payment of taxes to the gov-

---

*I note that on remand respondents may be able to amend their complaint to assert an attribution claim. See Fed. Rule Civ. Proc. 15.

ernment for purposes of supporting government speech is not nearly as intrusive as being forced to "utter what is not in [one's] mind," *Barnette, supra,* at 634, or to carry an unwanted message on one's property.

With these observations, I join the Court's opinion.

JUSTICE BREYER, concurring.

The beef checkoff program in these cases is virtually identical to the mushroom checkoff program in *United States* v. *United Foods, Inc.,* 533 U. S. 405 (2001), which the Court struck down on First Amendment grounds. The "government speech" theory the Court adopts today was not before us in *United Foods,* and we declined to consider it when it was raised at the eleventh hour. See *id.,* at 416–417. I dissented in *United Foods,* based on my view that the challenged assessments involved a form of economic regulation, not speech. See *id.,* at 428. And I explained that, were I to classify the program as involving "commercial speech," I would still vote to uphold it. See *id.,* at 429.

I remain of the view that the assessments in these cases are best described as a form of economic regulation. However, I recognize that a majority of the Court does not share that view. Now that we have had an opportunity to consider the "government speech" theory, I accept it as a solution to the problem presented by these cases. With the caveat that I continue to believe that my dissent in *United Foods* offers a preferable approach, I join the Court's opinion.

JUSTICE GINSBURG, concurring in the judgment.

I resist ranking the promotional messages funded under the Beef Promotion and Research Act of 1985, 7 U. S. C. § 2901 *et seq.,* but not attributed to the Government, as government speech, given the message the Government conveys in its own name. See, *e. g.,* U. S. Dept. of Health and Human Services and U. S. Dept. of Agriculture, Dietary Guidelines

for Americans 2005, pp. 69, 30, available at http://www. health.gov/dietaryguidelines/dga2005/document/ (as visited May 18, 2005, and available in Clerk of Court's case file) (noting that "*[t]rans* fatty acids . . . are present in foods that come from ruminant animals (*e. g.*, cattle and sheep)" and recommending that Americans "[l]imit intake of fats and oils high in saturated and/or *trans* fatty acids"); *post*, at 578, n. 7 (SOUTER, J., dissenting). I remain persuaded, however, that the assessments in these cases, as in *United States* v. *United Foods, Inc.*, 533 U. S. 405 (2001), and *Glickman* v. *Wileman Brothers & Elliott, Inc.*, 521 U. S. 457 (1997), qualify as permissible economic regulation. See *United Foods*, 533 U. S., at 425 (BREYER, J., dissenting). For that reason, I concur in the judgment.

JUSTICE KENNEDY, dissenting.

I join JUSTICE SOUTER's dissenting opinion, which demonstrates with persuasive analysis why the speech at issue here cannot meaningfully be considered government speech at all. I would reserve for another day the difficult First Amendment questions that would arise if the government were to target a discrete group of citizens to pay even for speech that the government does "embrace as publicly as it speaks," *post*, at 580.

JUSTICE SOUTER, with whom JUSTICE STEVENS and JUSTICE KENNEDY join, dissenting.

The Beef Promotion and Research Act of 1985, known as the Beef Act, taxes cattle sold in or imported into the United States at one dollar a head. 7 U. S. C. § 2904(8). Much of the revenue is spent urging people to eat beef, as in advertisements with the slogan, "Beef. It's What's for Dinner." App. 50. Respondent taxpayers, "South Dakota and Montana ranchers and organizations representing their interests," Brief for Respondents 1, object to the tax because they disagree with the advertisements' content, which they see as

a generic message that "beef is good." This message, the ranchers say, ignores the fact that not all beef is the same; the ads fail to distinguish, for example, the American ranchers' grain-fed beef from the grass-fed beef predominant in the imports, which the Americans consider inferior.

The ranchers' complaint is on all fours with the objection of the mushroom growers in *United States* v. *United Foods, Inc.*, 533 U. S. 405 (2001), where a similar statutory exaction was struck down as a compelled subsidy of speech prohibited by the First Amendment absent a comprehensive regulatory scheme to which the speech was incidental. The defense of the Government's actions in these cases, however, differs from the position of the United States in *United Foods.* There we left open the possibility that a compelled subsidy would be justifiable not only as one element of an otherwise valid regulatory scheme, but also as speech of the Government itself, which the Government may pay for with revenue (usually from taxes) exacted from those who dissent from the message as well as from those who agree with it or do not care about it. Not surprisingly, the Government argues here that the beef advertising is its own speech, exempting it from the First Amendment bar against extracting special subsidies from those unwilling to underwrite an objectionable message.

The Court accepts the defense unwisely. The error is not that government speech can never justify compelling a subsidy, but that a compelled subsidy should not be justifiable by speech unless the government must put that speech forward as its own. Otherwise there is no check whatever on government's power to compel special speech subsidies, and the rule of *United Foods* is a dead letter. I take the view that if government relies on the government-speech doctrine to compel specific groups to fund speech with targeted taxes, it must make itself politically accountable by indicating that the content actually is a government message, not just the statement of one self-interested group the government is

currently willing to invest with power. Sometimes, as in these very cases, government can make an effective disclosure only by explicitly labeling the speech as its own. Because the Beef Act fails to require the Government to show its hand, I would affirm the judgment of the Court of Appeals holding the Act unconstitutional, and I respectfully dissent from the Court's decision to condone this compelled subsidy.[1]

\* \* \*

In 1779 Jefferson wrote that "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves . . . is sinful and tyrannical." A Bill for Establishing Religious Freedom, in 5 The Founder's Constitution, No. 37, p. 77 (P. Kurland & R. Lerner eds. 1987), codified in 1786 at Va. Code Ann. § 57–1 (Lexis 2003). Although he was not thinking about compelled advertising of farm produce, we echoed Jefferson's view four years ago in *United Foods*, where we said that "First Amendment values are at serious risk if the government can compel a particular citizen, or a discrete group of citizens, to pay special subsidies for speech on the side that it favors . . . ." 533 U. S., at 411. *United Foods* addressed a scheme of enforced exaction virtually identical to the one here, except that the product involved was mushrooms, not beef. There, as here, a federal statute forced a targeted group (mushroom growers) to pay a tax that funded ads promoting its members' produce at a generic level objectionable to some of them. We held that the mushroom statute violated the growers' First Amendment right to refuse to pay for expression when they object to its content.[2]

---

[1] The Government's petition for certiorari also presented a question as to whether more limited relief might be available, but the Court denied certiorari on that question and hence it is not before us.

[2] We also noted that while the mushroom growers' disagreement with the ads' message "could be seen as minor . . . , there is no apparent principle which distinguishes out of hand minor debates about whether a

As the Court says, *ante*, at 557–559, *United Foods* was a descendent of two lines of precedent. The first, exemplified by *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624 (1943), and *Wooley* v. *Maynard*, 430 U. S. 705 (1977), stands for the principle that government may not force individuals to utter or convey messages they disagree with or, indeed, to say anything at all. The second, comprising *Keller* v. *State Bar of Cal.*, 496 U. S. 1 (1990), and *Abood* v. *Detroit Bd. of Ed.*, 431 U. S. 209 (1977), is authority for the related proposition that, absent substantial justification, government may not force targeted individuals to pay for others to speak.

Four years before *United Foods* we held that one such ground was present where enforced contribution to objectionable speech is incidental to a "broader collective enterprise in which th[e] freedom to act independently is already constrained by the regulatory scheme." *Glickman* v. *Wileman Brothers & Elliott, Inc.*, 521 U. S. 457, 469 (1997). As noted, *United Foods* left open the possibility of another justification, that the objectionable message is "government speech," which our case law suggests is immune to many types of First Amendment challenge. See *ante*, at 558–559.

Although we declined to address the pertinence of a government-speech justification in *United Foods,* it is crucial to the defense of the statute here because, as the District Court and the Court of Appeals observed (and as the Court appears to agree), these cases are factually on all fours with

---

branded mushroom is better than just any mushroom." *United Foods,* 533 U. S., at 411. The First Amendment, in other words, is not limited to "serious" or "substantial" disputes about content. Even if it were, the mushroom growers could have argued, as the ranchers could argue here, that because they would prefer to say nothing than to convey the message in the ads, the ads violate their First Amendment right not to speak at all. See, *e. g., Harper & Row, Publishers, Inc.* v. *Nation Enterprises,* 471 U. S. 539, 559 (1985) ("There is necessarily, and within suitably defined areas, a [First Amendment] freedom *not* to speak publicly, one which serves the same ultimate end as freedom of speech in its affirmative aspect" (internal quotation marks omitted)).

*United Foods.* See 335 F. 3d 711, 717 (CA8 2003) ("[W]e agree with the district court that '[t]he beef checkoff is, in all material respects, identical to the mushroom checkoff' " program challenged in *United Foods* (quoting 207 F. Supp. 2d 992, 1002 (SD 2002))), quoted *ante,* at 558. Unless, then, the doctrine of government speech is defined in such a way as to justify the targeted compulsion here, the enforced subsidy for beef ads must fail along with the mushroom subsidy. In my judgment the beef subvention should fail, for I, unlike the Court, do not believe that the beef ads qualify for treatment as speech by the Government.

The government-speech doctrine is relatively new, and correspondingly imprecise. In fact, the few cases in which we have addressed the doctrine have for the most part not gone much beyond such broad observations as "[t]he government, as a general rule, may support valid programs and policies by taxes or other exactions binding on protesting parties. Within this broader principle it seems inevitable that funds raised by the government will be spent for speech and other expression to advocate and defend its own policies." *Board of Regents of Univ. of Wis. System* v. *Southworth,* 529 U. S. 217, 229 (2000). Even at this somewhat early stage of development, however, two points about the doctrine are clear.

The first point of certainty is the need to recognize the legitimacy of government's power to speak despite objections by dissenters whose taxes or other exactions necessarily go in some measure to putting the offensive message forward to be heard. To govern, government has to say something, and a First Amendment heckler's veto of any forced contribution to raising the government's voice in the "marketplace of ideas"[3] would be out of the question. See

---

[3] See *Abrams* v. *United States,* 250 U. S. 616, 630 (1919) (Holmes, J., joined by Brandeis, J., dissenting) ("[T]he ultimate good desired is better reached by free trade in ideas—th[e] . . . best test of truth is the power of the thought to get itself accepted in the competition of the market . . . ").

*Keller, supra,* at 12–13 ("If every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in the private sector, and the process of government as we know it radically transformed").

The second fixed point of government-speech doctrine is that the First Amendment interest in avoiding forced subsidies is served, though not necessarily satisfied, by the political process as a check on what government chooses to say. "When the government speaks, for instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy." *Southworth, supra,* at 235; see also *Abood, supra,* at 259, n. 13 (Powell, J., concurring in judgment) ("[T]he reason for permitting the government to compel the payment of taxes and to spend money on controversial projects is that the government is representative of the people"). Democracy, in other words, ensures that government is not untouchable when its speech rubs against the First Amendment interests of those who object to supporting it; if enough voters disagree with what government says, the next election will cancel the message.

The adequacy of the democratic process to render the subsidization of government speech tolerable is, naturally, tied to the character of the subsidy. For when government funds its speech with general tax revenue, as it usually does, no individual taxpayer or group of taxpayers can lay claim to a special, or even a particularly strong, connection to the money spent (and hence to the speech funded). See *Massachusetts* v. *Mellon,* 262 U. S. 447, 486–487 (1923). Outrage is likely to be rare, and disagreement tends to stay temperate. But the relative palatability of a remote subsidy shared by every taxpayer is not to be found when the speech is funded with targeted taxes. For then, as here, the particular interests of those singled out to pay the tax are closely

linked with the expression, and taxpayers who disagree with it suffer a more acute limitation on their presumptive autonomy as speakers to decide what to say and what to pay for others to say. See *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.,* 515 U. S. 557, 573 (1995) ("[T]he fundamental rule of protection under the First Amendment [is] that a speaker has the autonomy to choose the content of his own message").[4]

When a targeted assessment thus makes the First Amendment affront more galling, it does, or should, follow that greater care is required to ensure that the political process can practically respond to limit the compulsion Jefferson inveighed against. Whereas it would simply be unrealistic to think that every speech subsidy from general revenue could or should be scrutinized for its amenability to effective politi-

---

[4] The Court asserts that in fact there is no difference between a taxpayer's challenge to speech funded with general revenues, which our precedents foreclose, and a challenge to speech funded with targeted taxes. But the Court's lone authority for that position, our statement in *United States* v. *Lee,* 455 U. S. 252 (1982), that "[t]here is no principled way . . . to distinguish between general taxes and those imposed under the Social Security Act," *id.,* at 260, quoted *ante,* at 562, is unavailing. *Lee* involved a religious objection to paying Social Security taxes, and the Court's statement in that case was grounded in the recognition that if the Government were required to accommodate the objection, there would be nothing to stop others from raising a similar religious objection to paying "general taxes." Here there is no comparable danger because of the commonsense notion that individuals feel a closer connection to speech that they are singled out to fund with targeted taxes than they do to expression paid for with general revenues. We recognized this in *Massachusetts* v. *Mellon,* 262 U. S. 447 (1923), where we noted that the individual taxpayer's "interest in the moneys of the Treasury—partly realized from taxation and partly from other sources—is shared with millions of others [and] is comparatively minute and indeterminable." *Id.,* at 487. This commonsense notion, then, provides a "principled way" to distinguish in this context between targeted and general taxes. The Court in *Lee* seemed to recognize that its reasoning might be limited in this way, as the unredacted version of its statement reads: "[t]here is no principled way, however, for purposes of this case, to distinguish between general taxes and those imposed under the Social Security Act." 455 U. S., at 260.

cal response, the less-common targeted speech subsidies can be reviewed specifically for their susceptibility to response by the voters, and the intensity of the provocation experienced by the targeted group justifies just such scrutiny.

In these cases, the requirement of effective public accountability means the ranchers ought to prevail, it being clear that the Beef Act does not establish an advertising scheme subject to effective democratic checks. The reason for this is simple: the ads are not required to show any sign of being speech by the Government, and experience under the Act demonstrates how effectively the Government has masked its role in producing the ads.[5] Most obviously, many of them include the tagline, "[f]unded by America's Beef Producers," App. 50–51, which all but ensures that no one reading them will suspect that the message comes from the National Government.[6] But the tagline just underscores the point that would be true without it, that readers would most naturally think that ads urging people to have beef for dinner were placed and paid for by the beef producers who stand to profit when beef is on the table. No one hearing a commercial for Pepsi or Levi's thinks Uncle Sam is the man talking behind the curtain. Why would a person reading a beef ad think

---

[5] The Court thinks it is enough that the Government is not required to mislead in this way. *Ante,* at 564, n. 7. This view that the statute is saved because it might be applied without misleading readers apparently reflects the Court's position that these cases involve a facial challenge. *Ante,* at 564–565. But the challenge here is to the application of the statute through actual, misleading ads, as shown by a record replete with examples.

[6] Disputing this, petitioners Nebraska Cattlemen, Inc., et al., suggest that any danger of confusion is eliminated by the inclusion in the beef ads of a red checkmark with the word "beef" atop it, because this "distinctive checkoff logo is a direct sign that the ads are disseminated pursuant to the federal checkoff program." Reply Brief for Petitioners in No. 03–1165, pp. 15–16. It seems to me quite implausible that most (or even some) Americans associate a red checkmark underneath the word "beef" with the Federal Government. Indeed, it strikes me that even someone generally familiar with the Beef Act and its taxation mandate might not recognize the checkoff logo as signifying Government involvement.

Uncle Sam was trying to make him eat more steak?[7] Given the circumstances, it is hard to see why anyone would suspect the Government was behind the message unless the message came out and said so.

The Court takes the view that because Congress authorized this scheme and the Government controls (or at least has a veto on) the content of the beef ads, the need for democratic accountability has been satisfied. See *ante*, at 563–564. But the Court has it backwards. It means nothing that Government officials control the message if that fact is never required to be made apparent to those who get the message, let alone if it is affirmatively concealed from them. The political accountability of the officials with control is insufficient, in other words, just because those officials are allowed to use their control (and in fact are deliberately using it) to conceal their role from the voters with the power to hold them accountable.[8] Unless the putative government

---

[7] Moreover, anyone who did draw such an unlikely connection would also have to believe that Uncle Sam was having a hard time making his mind up, for other, expressly governmental messages take a different view of how much beef Americans should be eating. Dietary Guidelines for Americans 2005, a publication of the Departments of Agriculture and of Health and Human Services, discusses beef in a chapter entitled "Fats." Http://www.health.gov/dietaryguidelines/dga2005/document (as visited May 16, 2005, and available in Clerk of Court's case file). The message of that chapter is that most Americans need to reduce their consumption of fats, and should get most of the fats they do eat from sources other than beef, namely, fish, nuts, and vegetable oils. See *id.*, at 29–31. That the report, which the Secretaries of Agriculture and of Health and Human Services say "is intended to be a primary source of dietary health information," *id.*, at i, does not encourage the consumption of beef (as the beef ads do) is clear from the fact that a different chapter, which discusses fruits, vegetables, whole grains, and fat-free dairy products, is entitled "Food Groups to Encourage," *id.*, at 23.

[8] Notably, the Court nowhere addresses how, or even whether, the benefits of allowing government to mislead taxpayers by concealing its sponsorship of expression outweigh the additional imposition on First Amendment rights that results from it. Indeed, the Court describes no benefits from its approach and gives no reason to think First Amendment doctrine

speech appears to be coming from the government, its governmental origin cannot possibly justify the burden on the First Amendment interests of the dissenters targeted to pay for it.[9]

Nor is it any answer that resourceful taxpayers could discover the Government behind the beef ads by doing research on the implementation of the Beef Act. Of course a taxpayer could discover the facts by looking hard enough, but what would tip off the taxpayer to look? And even if a few taxpayers did unearth the truth it would not matter, for the First Amendment harm cannot be mitigated by the possibility that a few cognoscenti may actually understand how the scheme works. If the judiciary is justified in keeping hands off special assessments on dissenters from government speech, it is because there is a practical opportunity for political response; esoteric knowledge on the part of a few will not do.

should accommodate the Government's subterfuge. The Court merely observes that no precedent requires the Government to show its hand when it seeks to defend a targeted assessment by claiming government speech. *Ante*, at 564, n. 7. That is of course to be expected, since the government-speech doctrine is so new that the Government has never before enjoyed the opportunity to invoke it in this Court when attempting to justify the type of compelled subsidy struck down in *United Foods*. Since the Court now says the Government need never show its hand in cases like this one, *ante*, at 564–565, there is no chance for an effective political check on forced funding for speech, however objectionable.

[9] That said, I do not mean to suggest that explicitly labeling speech as that of government would suffice when individuals must personally convey government's message, as in *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624 (1943), and *Wooley* v. *Maynard*, 430 U. S. 705 (1977). The infringement on the speaker's autonomy in those situations is greater than in cases like the ones before us today, so great that it cannot be saved by allowing speakers to inform listeners that they (the speakers) are simply communicating a government message or that they disagree with the message. The Court apparently took the same view in *Wooley*, as it was unmoved by the dissent's observation in that case that New Hampshire drivers were free to "place on their bumper a conspicuous bumper sticker explaining in no uncertain terms that they do not profess the motto 'Live Free or Die.'" *Id.*, at 722 (opinion of REHNQUIST, J.).

In sum, the First Amendment cannot be implemented by sanctioning government deception by omission (or by misleading statement) of the sort the Court today condones, and expression that is not ostensibly governmental, which government is not required to embrace as publicly as it speaks, cannot constitute government speech sufficient to justify enforcement of a targeted subsidy to broadcast it. The Court of Appeals thus correctly held that *United Foods* renders the Beef Act's mandatory-assessment provisions unconstitutional.[10]

---

[10] Petitioners also defend the Beef Act by pointing to *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557 (1980), where we subjected restrictions on commercial speech to a less rigorous level of review than that applied to restrictions on most other types of speech. But the Court strongly suggested in *Glickman* v. *Wileman Brothers & Elliott, Inc.*, 521 U. S. 457, 469 (1997), and in *United States* v. *United Foods, Inc.*, 533 U. S. 405 (2001), both that *Central Hudson* scrutiny is not appropriate in a case involving compelled speech rather than restrictions on speech, and that even if some relaxed standard of review analogous to *Central Hudson* were employed the Beef Act would not survive it. See *Glickman, supra,* at 474, n. 18 ("The Court of Appeals fails to explain why the *Central Hudson* test, which involved a restriction on commercial speech, should govern a case involving the compelled funding of speech"); *United Foods, supra,* at 410 ("[E]ven viewing commercial speech as entitled to lesser protection, we find no basis under either *Glickman* or our other precedents to sustain the compelled assessments sought in this case"). Petitioners do not explain why we should depart from these intimations that restrictions on speech are not judged by the same standard as compelled speech.