EASTERBROOK, Chief Judge,
dissenting.
I agree with Judge Ripple about how the Supreme Court’s current doctrine applies to these events. I also agree with Judge Posner that this doctrine is too plastic, making it easy for judges to disagree about its application, as we do today. If the current establishment-clause doctrine had been announced by Congress or an administrative agency, the Supreme Court would declare it unconstitutionally vague. See FCC v. Fox Television Stations, Inc., — U.S.-, 132 S.Ct. 2307, 183 L.Ed.2d 234, No. 10-1293 (U.S. June 21, 2012). It is hard to see why the Judicial Branch should exercise more discretion in formulating doctrine than it accords to other branches of government.
Standards such as those found in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), and the “no endorsement” rule, not only are hopelessly open-ended but also lack support in the text of the first amendment and do not have any historical provenance. They have been made up by the Justices during recent decades. The actual Establishment Clause bans laws respecting the establishment of religion — which is to say, taxation for the support of a church, the employment of clergy on the public payroll, and mandatory attendance or worship. See generally Leonard W. Levy, The Establishment Clause: Religion and the First Amendment (2d ed. 1994); Philip Hamburger, Separation of Church and State 89-107 (2002); Michael W. McConnell, Establishment and Disestablishment at the Founding, Part I: Establishment of Religion, 44 Wm. & Mary L.Rev. 2105 (2003). Holding a high school graduation in a church does not “establish” that church any more than serving Wheaties in the school cafeteria establishes Wheaties as the official cereal. See also Michael W. McConnell, Coercion: The Lost Element of Establishment, 27 Wm. & Mary L.Rev. 933 (1986).
The rationale of judicial review is that the Constitution prevails over legislation through conflict-of-laws principles. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). When the Constitution does not contain legal rules on a particular topic, then the people, through their elected representatives and their appointees, are entitled to decide. Those who believe the decision of the Elmbrook School District unwise or offensive — and it may well be both — can ask for relief from legislatures, which historically have protected the rights of religious minorities. (The Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb to 2000bb-4, and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc to 2000cc-5, are recent examples. Allowing conscientious objection to military service is an older one.) The federal judiciary cannot invoke Marbury when it is judges, rather than those who wrote and approved the Constitution, who create the rules. And as both Lemon and the no-endorsement approach are judicial creations rather than restatements of the first amendment’s meaning, they do not justify a claim by judges to have the final word. I have made this point elsewhere, so I do not present an extended argument here. See Frank H. Easterbrook, Abstraction and Authority, 59 U. Chi. L.Rev. 349 (1992); Frank H. Easterbrook, Textualism and the Dead Hand, 66 Geo. Wash. L.Rev. 1119 (1998). See also American Jewish Congress v. Chicago, 827 F.2d 120, 128-40 (7th Cir.1987) (dissenting opinion).
*870 The District needed a large, air-conditioned auditorium for graduation. It rented one for the day. The record does not show (indeed, plaintiffs do not contend) that the District rented space from Elm-brook Church because of its status as a church — as opposed to indifference to its status as a church, or even despite its status as a church. Cf. Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). The record does not show that the District wanted to “send a message.” Quite the contrary: as soon as suitable space was available in the District’s own facilities, it stopped using the church. The only message a reasonable observer would perceive is that comfortable space is preferable to cramped, overheated space. It may be hard to define the reasonable observer. But all of the Justices agreed in Capitol Square Review & Advisory Board v. Pinette, 515 U.S. 753, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995), that the benchmark is a reasonable rather than an obtuse observer. No reasonable observer believes that renting an auditorium for a day endorses the way the landlord uses that space the other 364 days.
Elmbrook Church is full of religious symbols — but any space is full of symbols. Suppose the School District had rented the United Center, home of the Chicago Bulls and the Chicago Blackhawks. A larger-than-life statue of Michael Jordan stands outside; United Airlines’ logo is huge. No one would believe that the School District had established basketball as its official sport or United Airlines as its official air carrier, let alone sanctified Michael Jordan. And if the District had rented the ballroom at a Hilton hotel, this would not have endorsed the Hilton chain or ballroom dancing.
Suppose instead that the School District had rented a movie theater, full of posters for current and future attractions. Would this have endorsed movies or coerced anyone to buy tickets? Of course not. Thus if, as many decisions hold, the government is entitled to be neutral between religion and non-religion, e.g., Employment Division v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), there is no basis for distinguishing Elmbrook Church from the United Center, the Hilton Milwaukee City Center, or the Palace Theater. Neutrality requires the state to treat religious beliefs and symbols the same as secular beliefs and symbols, not to disfavor religion. The Court has held that public bodies sometimes may choose to avoid dealing with a religious vendor, but it has not held that avoidance is compulsory. Compare Locke v. Davey, 540 U.S. 712, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004) (a state may decline to extend scholarships for education at a seminary), with Witters v. Washington Department of Services for the Blind, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986) (Establishment Clause allows such scholarships, if the state is neutral between religious and secular educations).
My colleagues in the majority say that “the message of endorsement carried an impermissible aspect of coercion” (Op. 856). If there’s no endorsement, there’s no coercion either. But the majority does not explain how endorsement coerces. If the District were to name Steinway the “official piano of Elmbrook School District,” this would not coerce any student or family member to favor Steinway over Baldwin or Yamaha in his musical life, or play the piano rather than the piccolo. In school-prayer decisions such as Lee v. Weisman, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), and Santa Fe Independent School District v. Doe, 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000), the Court found that fear of ostracism for public refusal to rise and pray *871 could coerce non-believers to participate. But no prayer or other worship occurred during the School District’s graduations; no signs of assent were elicited, so no one was at risk of ostracism for withholding them.
Government often takes sides. Many decisions, of which Johanns v. Livestock Marketing Association, 544 U.S. 550, 125 S.Ct. 2055, 161 L.Ed.2d 896 (2005), is a recent example, hold that government is entitled to articulate the position held by elected officials. In Livestock Marketing the messages favored the consumption of beef. Producers who did not want to send that message (at least, did not want to pay for it) protested that they had been coerced, but the Court held that the dissenting producers could not use the first amendment to oblige the government to desist. The government cannot compel any private person to speak (or to keep silent), but the government’s expression of its own views does not coerce anyone else to do anything — either to praise or eat beef, or to disdain chicken.
My colleagues’ assertion that endorsement is coercive cannot be reconciled with Livestock Marketing. The government-speech doctrine articulated in Livestock Marketing applies to religious subjects as well as secular ones: Pleasant Grove v. Summum, 555 U.S. 460, 129 S.Ct. 1125, 172 L.Ed.2d 858 (2009), holds that a public body may erect its own monuments, expressing its own point of view, without entitling a religious group to equal space. Similarly, Congress may add “under God” to the Pledge of Allegiance as its own point of view without coercing anyone to say the words. See Sherman v. Wheeling School District, 980 F.2d 437 (7th Cir.1992). The President’s call for a National Day of Prayer does not coerce anyone to pray. See Freedom From Religion Foundation, Inc. v. Obama, 641 F.3d 803 (7th Cir.2011). Perhaps Summum will lead the Court to reconsider the no-endorsement branch of Establishment Clause doctrine; but whether it does or not, Summum and other government-speech cases show that endorsement differs from coercion.
If holding graduation in a church endorses that church and coerces support of its religion, does holding elections in a church endorse that church or coerce support of its religion? At least two appellate courts have held that government may use churches as convenient polling places. See Otero v. State Election Board, 975 F.2d 738 (10th Cir.1992); Berman v. Board of Elections, 19 N.Y.2d 750 (1967). The majority disclaims having an opinion on that topic (Op. 843), but we cannot disavow the logical implications of our decisions. The churches in Otero and Berman surely were as “pervasively religious” (Op. 856) as Elmbrook Church; all churches are “pervasively religious.” If graduation in a church is forbidden because renting a religious venue endorses religion, and if endorsement is coercive, then renting a religious venue for voting must be equally unconstitutional.
All of the objections the majority makes to graduation in a church apply to voting in a church. At oral argument, counsel for the plaintiffs contended that voting is not problematic because voters spend less time in polling places than students and families do in graduation ceremonies. This may or may not be true. Sometimes there are long lines. Anyway, for persons who object on principle to entering a house of worship, or a place where a faith different from theirs worships, the length of time inside is irrelevant; these persons will not pass the doors.†'
*872 It is easier to justify graduation in a church than voting in a church. No one should feel obliged by conscience or faith to give up his influence in governance— and that’s what voting represents. A rule of neutrality between religious and secular sites permits government to use religious venues for graduation and voting alike, though I do not think it wise to use a church for either function. But acting inconsiderately toward persons whose sincere views disfavor conducting public business in religious venues differs from establishing a religion.

 In some jurisdictions, including Wisconsin, any voter "unable or unwilling” to vote at the *872 designated polling place may cast an absentee ballot. See Wis. Stat. § 6.20. Other states limit absentee voting to persons who will be out of the jurisdiction, are not ambulatory, or for other reasons cannot vote in person. Still others take a middle position. Indiana permits mail voting by persons whose faith prohibits them from entering a house of worship being used as a polling place. Ind.Code § 3-11-10-24(a)(9). Persons whose beliefs make voting in a church obnoxious, but do not prohibit that act on religious grounds, are not similarly accommodated. Cf. Berman v. Board of Elections, 420 F.2d 684 (2d Cir. 1969) (holding that accommodating those whose religious views prohibit entry is constitutionally sufficient and adding, id. at 686, that "any incidental burden [from holding elections in churches] is so slight that it does not begin to outweigh the interest of the state in having available to it the additional polling places which the use of the churches affords.”). Absentee voting therefore is not a general solution — and voters who want to follow the campaign to the end may choose to avoid absentee voting even when they are eligible.