

STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-14-414

MAINERS FOR FAIR BEAR
HUNTING and KATIE
HANSBERRY,
     Plaintiffs

v.

MAINE DEPARTMENT OF
INLAND FISHERIES AND
WILDLIFE,
     Defendant

and

MAINE WILDLIFE
CONSERVATION COUNCIL,
     Intervener

ORDER ON DIFW'S
MOTION TO DISMISS

STATE OF MAINE
Cumberland ss Clerk's Office

MAR 3 1 2015

RECEIVED

Before the court is defendant Department of Inland Fisheries & Wildlife ("DIFW")'s motion to dismiss count II of the complaint. Following the election on November 4, 2014 in which Question 1 was defeated, defendant argues that plaintiffs lack standing and that count II is moot. Maine Wildlife Conservation Council ("MWCC"), which opposed Question 1, joins in the motion. For the following reasons, the motion is granted.

## Background

Plaintiff Mainers for Fair Bear Hunting ("MFBH") is a Maine Ballot Question Committee and was a proponent of Question 1, which read: "Do you want to ban the use of bait, dogs or traps in bear hunting except to protect property, public safety, or for research?" Plaintiff Katie Hansberry served as MFBH's campaign director. Voters rejected the measure.

Leading up to the election, plaintiffs filed their two-count complaint on September 30, 2014. Count I alleged certain FoAA violations and has been largely resolved. The parties agreed to bifurcate counts I and II to allow the court to enter a final judgment on plaintiffs' primary claim. (3/16/15 Stipulation.) Count II alleges the illegal expenditure of public funds over DIFW's advocacy against Question 1, which, most notably, included MWCC's TV commercials showing DIFW staff in uniform discussing their opposition to the ballot measure. Plaintiffs filed a motion for a temporary restraining order, which the court denied on October 22, 2014. Plaintiffs sought expedited review in the Law Court, but the Law Court declined to expedite the case on October 30, 2014. Plaintiffs then withdrew their appeal. On March 6, 2015, defendant moved to dismiss count II of plaintiffs' complaint.

## Discussion

Defendant challenges plaintiffs' standing and argues that count II is moot. "Standing and mootness are closely related concepts describing conditions of justiciability." *Madore v. Me. Land Use Regulation Comm'n*, 1998 ME 178, ¶ 8, 715 A.2d 157. "Standing to sue means that the party, at the commencement of the litigation, has sufficient personal stake in the controversy to obtain judicial resolution of that controversy." *Halfway House, Inc. v. City of Portland*, 670 A.2d 1377, 1379 (Me. 1996). "When a party initially holds the requisite personal interest, but is later divested of that interest" the doctrine of mootness applies. *Madore*, 1998 ME 178, ¶ 8, 715 A.2d 157. As the major organizing proponent of Question 1, the court is satisfied that plaintiff MFBH and its campaign director had a sufficient stake in the controversy at the outset of litigation to present a justiciable case. *See McCaffrey v. Gartley*, 377 A.2d 1367, 1370 (Me. 1973). The court will therefore focus on whether count II is moot.

2

**Mootness**

In deciding whether a case is moot, the court must determine "whether there remain sufficient practical effects flowing from the resolution of the litigation to justify the application of limited judicial resources." *Halfway House, Inc. v. City of Portland*, 670 A.2d 1377, 1380 (Me. 1996). The issue is often phrased in terms of whether a decision from the court could provide the litigants with any effective relief. *Me. Civil Liberties Union v. City of S. Portland*, 1999 ME 121, ¶ 8, 734 A.2d 191. "The mootness doctrine preserves the 'flexibility of the law by not creating unnecessary precedent.'" *Gordan v. Cummings*, 2000 ME 68, ¶ 10, 756 A.2d 942 (quoting *Graffam v. Wray*, 437 A.2d 627, 631 (Me. 1981)).

Plaintiffs' allegations in count II of the complaint are all focused on campaign activity leading up to the Question 1 vote. (Compl. ¶¶ 98, 102-103.) Plaintiffs request for relief under count II states:

> [T]he plaintiffs respectfully request this Court to (a) permanently enjoin IF&W from further use of agency resources, including staff time, to oppose Question 1; (b) order IF&W to immediately remove political content from its website, YouTube channel, and other outlets; (c) order that the current television advertisement produced using IF&W resources be immediately removed from the air; (d) order repayment of funds illegally expended to the Treasurer of the State of Maine; (e) award Plaintiffs their attorneys' fees and other costs for the maintenance of this action; and (f) grant such other and further relief as this Court may deem just and appropriate.

Now that the election is over, the agency is no longer using any resources to oppose Question 1 and the television ads are no longer airing. The court does not have the authority to invalidate the election results. *Me. Sch. Admin. Dist. No. 37 v. Pineo*, 2010 ME 11, ¶ 8, 988 A.2d 987. Therefore, the court cannot grant plaintiffs any effective relief.[1] *See Campaign for Sensible*

---

1 Plaintiffs do not have standing to seek repayment of any funds to the Treasurer of the State of Maine. *See Ouellette v. Mills*, 22 F. Supp. 3d 36, 41 (D. Me. 2014) (explaining that standing generally requires "a plaintiff to show that his claim is premised on his own legal rights").

*Transp. v. Me. Tpk. Auth.*, 658 A.2d 213, 215 (1995) ("Because the granting of an injunction preventing expenditure of toll revenues to influence the 1991 referendum's outcome would afford no effective relief to CST, its appeal is rendered moot."). Plaintiffs' claim is moot.

Plaintiffs urge the court to find that one of the exceptions to the mootness doctrine applies in this case.

**Exceptions to Mootness Doctrine**

When a case is moot, the court may nevertheless consider the merits if one of the following three exceptions to the mootness doctrine applies: "(1) sufficient collateral consequences will result from the determination of the questions presented so as to justify relief; (2) the appeal contains questions of great public concern that, in the interest of providing future guidance to the bar [the court] may address; (3) the issues are capable of repetition but evade review because of their fleeting or determinate nature." *Halfway House, Inc.*, 670 A.2d at 1380. The court will address these exceptions individually.

### 1) Collateral Consequences Exception

Before considering the merits under the collateral consequences exception, plaintiffs must show "that a decision on the merits . . . will have more than conjectural and insubstantial consequences in the future." *Sordyl v. Sordyl*, 1997 ME 87, ¶ 6, 692 A.2d 1386 (internal quotation marks omitted). For example, the consequences of a criminal conviction or an involuntary commitment, which might include loss of certain privileges or enhanced penalties for future convictions or commitments, are sufficient to allow the court to hear a case. *In re Walter R.*, 2004 ME 77, ¶¶ 10-11, 850 A.2d 346. Plaintiffs' complaint was based on DIFW's advocacy around Question 1, which has ended. Plaintiffs have failed to show how a decision on

4

the merits will have anything other than speculative consequences in the future. The collateral consequences exception does not apply.

### 2) Public Interest Exception

In applying the second exception, the court must consider "whether the question is public or private, how much court officials need an authoritative determination for future rulings, and how likely the question is to recur in the future." *Me. Sch. Admin. Dist. No. 37,* 2010 ME 11, ¶ 10, 988 A.2d 987 (quoting *Young v. Young,* 2002 ME 167, ¶ 9, 810 A.2d 418). There is certainly a public interest in ensuring the integrity of elections. As discussed in the court's previous order, however, cases concerning the expenditure of public funds can be very fact-specific. (10/22/14 Order.) The court must determine the scope of an agency's authority to expend funds and look at the alleged campaign activity to determine whether it constitutes impermissible advocacy. *See Campaign for Sensible Transp. v. Me. Tpk. Auth.,* 1991 Me. Super. LEXIS 228, at *10-17 (Oct. 8, 1991). The court's ruling in this case would therefore have limited applicability in situations involving other state agencies with different authority, a different ballot question, and different plaintiffs. *See Young,* 2002 ME 167, ¶ 10, 810 A.2d 418 (declining to apply the public interest exception where an authoritative determination could be of great benefit but "the facts [did] not allow [the court] to analyze all relevant facets of the . . . statute"); *see also In re Steven L.,* 2014 ME 1, ¶ 8, 86 A.3d 5 ("[O]ur consideration of the issues raised on appeal would not generate meaningful authority for future decision-making, and we cannot conclude that the narrow issues in this case are likely to repeat themselves in the future."). It would be prudent to consider the issues raised by plaintiffs' complaint in the context of an ongoing controversy and a live ballot question.

5

### 3) Issue Evading Review Exception

The final exception to the mootness doctrine applies if this type of issue is repeatedly presented to courts but is of such short duration that it escapes review. *In re Walter R.*, 2004 ME 77, ¶ 9, 850 A.2d 346. Plaintiffs argue that this controversy is bound to repeat itself in the next election because plaintiffs intend to submit a similar ballot initiative for the 2016 election. This assumes, however, that the identical question will be presented and defendant will engage in the same advocacy efforts to oppose the measure. The cases on which plaintiffs rely concerned straightforward questions of law. *See, e.g., Libertarian Party of Me. v. Dunlap*, 659 F. Supp. 2d 215, 217, (D. Me. 2009) (considering whether the state could impose a deadline for the submission of signatures for a non-party candidate to get on the ballot). In addition, unlike other election cases in which this exception applied, *see, e.g., Fredette v. Secretary of State*, 1997 ME 105, ¶¶ 2, 4, 693 A.2d 1146 (concluding that challenge to rule for primary election recounts would likely evade review presumably because general election occurs within several months of primary), this is not a case in which the issue is likely to evade review in the future.

Plaintiffs knew as early as September 2013, over a year before the election, that DIFW was going to publicly oppose Question 1. (Compl. ¶ 28.) Plaintiffs waited over a year to file their complaint challenging DIFW's campaign activity. If the plaintiffs sponsor a similar ballot question for the 2016 election, they will be able to get a timely decision on the issue well before the election.

### Conclusion

Plaintiffs' claim is premised on campaign activity related to Question 1 on the November 2014 ballot. The case became moot after the election. Based on the facts of this case, none of the exceptions to the mootness doctrine apply. Although plaintiffs' complaint raises a potentially

important legal question, the court should consider that question in the context of a live controversy.

The entry is:

Count II of plaintiffs' complaint is dismissed as moot.

Per the parties' stipulation, this order constitutes a final judgment for the purposes of appeal.

Date: 3\31\15

Joyce A. Wheeler
Justice, Superior Court

Plaintiffs-Rachel Wertheimer Esq
Defendant DIF&W-Scott Boak AAG/Mark Randlett AAG
Intervenor-Paul McDonald Esq/Daniel Murphy Esq

7

STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-14-414

CUM-JAW-10-22-14

MAINERS FOR FAIR BEAR
HUNTING and KATIE
HANSBERRY,
        Plaintiffs

v.

MAINE DEPARTMENT OF
INLAND FISHERIES AND
WILDLIFE,
        Defendant

and

MAINE WILDLIFE
CONSERVATION COUNCIL,
        Intervener

ORDER ON MOTION
FOR TEMPORARY
RESTRAINING ORDER

STATE OF MAINE
Cumb     nd    C' k's Office

OCT 22 2014

RECEIVED

## BACKGROUND

Before the court is the plaintiffs Mainers for Fair Bear Hunting and Katie Hansberry (collectively, "MFBH")'s motion for a temporary restraining order. MFBH argues that defendant Department of Inland Fisheries and Wildlife ("DIFW" or the "Department") is engaged in illegal campaign activity against Question 1—a ballot initiative that would ban bear baiting, hounding, and trapping—on the November 2014 ballot.

In November, Maine voters will have an opportunity to vote on Question 1, which reads: "Do you want to ban the use of bait, dogs or traps in bear hunting except to protect property, public safety, or for research?" Plaintiff Mainers for Fair Bear Hunting is a Maine Ballot Question Committee and

proponent of Question 1. Plaintiff Katie Hansberry is a Maine resident who serves as Campaign Director for Plaintiff Mainers for Fair Bear Hunting.

The Department is a Maine state agency charged with, among other things, preserving, protecting, and enhancing the inland fisheries and wildlife resources of the State; encouraging the wise use of these resources; and effectively managing these resources. 12 M.R.S. § 10051. The Commissioner of DIFW and DIFW have the responsibility, pursuant to 12 M.R.S. §§ 10053(1) and 10103(2), to manage all wildlife resources in Maine. When necessary to accomplish their statutory duties, the Commissioner and DIFW have the statutory duty, pursuant to 12 M.R.S. §10105(1), to authorize the taking of wildlife, including bears, subject to conditions and restrictions established by the Commissioner and DIFW. Pursuant to 12 M.R.S. § 10056, they are also charged with increasing the public's knowledge and understanding of wildlife resources and the management of those resources, and with the promotion of such resources. The Commissioner and DIFW have the authority, pursuant to 12 M.R.S. § 10108(2), to implement programs to promote the hunting of Maine wildlife, including the hunting of bears. Such programs "may include coordination of activities between the public and private sectors and utilization of promotional missions, exhibits, brochures, technical assistance and expertise as necessary to develop and promote" hunting activities in Maine, including the hunting of bears.

According to Andrea Erskine[1], Deputy Commissioner of DIFW, DIFW, and its Commissioner, based on their experience and expertise, consider bear baiting, hounding, and trapping to be legitimate forms of bear hunting in Maine.

---

[1] *See* affidavit of Andrea Erskine, dated October 14, 2014, and filed with the court on October 17, 2014.

2

Erskine Aff. ¶ 9. This has been so historically since at least 1989. Erskine Aff. ¶¶ 9, 11. The Commissioner and DIFW consider these methods to be not only the most effective forms of management of Maine's bear population, but also to be necessary and essential. Erskine Aff. ¶ 9. They believe the elimination of these forms of bear hunting in Maine would severely handicap their ability to effectively manage Maine's bear population. *Id.* DIFW takes the position that if bear baiting, hounding and trapping were not permitted in Maine, the Maine bear population would grow and expand until bear numbers became limited by the amount of food their habitat could produce. *Id.* If this were to occur, more bears would die of starvation and disease and would be killed in order to prevent conflicts with people, and public safety and property damage concerns as the result of bear activity would increase dramatically. *Id.*

The Commissioner and DIFW, since at least 1989, have consistently interpreted their statutory directives and authority as requiring them to publicly encourage and promote bear baiting, hounding and trapping as legitimate forms of bear hunting and as effective and necessary forms of bear management in Maine. Erskine Aff. ¶ 10. The Commissioner and DIFW have also consistently interpreted their statutory directives and authorities as obligating them to engage in affirmative public outreach efforts on bears, bear hunting (including bear baiting, trapping, and hounding), and bear management in Maine, as well as on DIFW's views and positions on those issues. *Id.* ¶ 10.

Historically, DIFW has taken a variety of actions to fulfill their statutory directives and to inform the public on DIFW's views on bears, bear hunting (including bear baiting, hounding and trapping) and bear management. DIFW's Bear Fact Sheet, about which the plaintiffs complain, has been publicly available

3

since at least 2004. Erskine Aff. ¶ 11, Ex. A, B, C. More recently, DIFW's actions, also about which the Plaintiffs complain, include the Commissioner holding a press conference and issuing a statement in response to the announcement that the ballot question had been approved; DIFW employees appearing in and expressing DIFW's views during television advertisements that were filmed, produced and paid for by Maine Wildlife Conservation Council ("MWCC"); and DIFW employees attending as guests banquets held by Maine Bowhunters Association and MWCC. Erskine Aff. ¶ 16. At this point, DIFW has no plans to expend additional agency funds or resources to create YouTube videos supporting bear baiting, hounding or trapping prior to the November 2014 ballot question. Erskine Aff. ¶ 14. Nor does DIFW plan to make any changes or updates to its informational Bear Fact Sheet, or to create any other DIFW visual media projects involving bears, bear baiting, hounding or trapping, or bear management prior to the November 2014 ballot question. *Id.* DIFW does, however, intend to continue to disseminate information to the public by releasing additional YouTube videos that were completed before the filing of the lawsuit, and to otherwise continue to encourage and promote through its existing website resources, social media, verbally, and in written form bear baiting, hounding and trapping as legitimate forms of bear hunting and as effective and necessary bear management practices in Maine, and to oppose ballot initiative Question 1. *Id.*

DIFW opposes Question 1 because if it passes, it will lose the only effective tools available to control the State's bear population. DIFW argues that it is protected by the government free speech doctrine. MFBH contend that this doctrine does not apply because they do not raise constitutional claims, rather

4

they contend that DIFW is engaged in an unauthorized and *ultra vires* use of public funds for campaign activity, the full nature and extent of which remains unknown to the plaintiffs because of DIFW's slow response to plaintiffs' FOAA requests. Plaintiffs contend that once the election is over, there is no possible relief to remedy the alleged violations by DIFW. MFBH seek in this motion to stop DIFW from "unlawfully and irreparably influencing the outcome of the election via impermissible political activity." (Pl.'s Mt. 18.) MFBH argues that the Department cannot use its resources, including staff time, to advocate only one side of a controversial question and undoubtedly influence the outcome of the election. Plaintiffs' motion asks this court to order DIFW "to cease further use of [DIFW] resources on campaign activity; to immediately remove partisan political content from [DIFW's] website, YouTube channel, Facebook page and other media outlets; to immediately terminate the dissemination of television advertisements produced using DIFW staff time and resources." (Pl.'s Mt. 20.)

The intervener Maine Wildlife Conservation Council ("MWCC") is a Ballot Question Committee formed to influence the statewide referendum on Question 1. MWCC owns the TV advertisements and opposes the plaintiffs' motion as an impermissible prior restraint on its free speech rights. There is no dispute, for the most part, that DIFW and the Ballot Question Committees, such as MWCC, are working with DIFW to influence the outcome of the referendum; therefore, the court will not repeat here the specific claims of the plaintiffs' concerning the ways that DIFW's campaign activity exceeds the authorized "fair

---

2 The plaintiffs set forth the specific violations in their motion at pages 3-8.

5

comment" and "dissemination of information". Rather, the court will address whether DIFW can be restrained as plaintiffs request.

Even if the plaintiffs were to prevail on their *ultra vires* argument, they have failed to demonstrate that the government free speech doctrine is inapplicable, they will suffer irreparable harm, and the public interest will not be adversely affected by granting the TRO. The alleged harm is that DIFW's activity will influence the outcome of the election, notwithstanding the effort of the plaintiffs to reach out to the voters to inform them of the value and benefits of enacting the referendum. Influencing the outcome of the election is precisely what DIFW hopes to do. DIFW believes, based on its experience and expertise, that it is obligated to publicly encourage and promote bear baiting, hounding and trapping as legitimate forms of bear hunting and as effective and necessary forms of bear management in Maine.

## DISCUSSION

### Temporary Restraining Order

On a motion for a temporary restraining order (TRO), the moving party has the burden to demonstrate that

> (1) it will suffer irreparable injury if the injunction is not granted;
> (2) such injury outweighs any harm which granting the injunctive relief would inflict on the other party;
> (3) it has a likelihood of success on the merits (at most, a probability; at least, a substantial possibility); and
> (4) the public interest will not be adversely affected by granting the injunction.

*Bangor Historic Track, Inc. v. Dep't of Agric.*, 2003 ME 140, ¶ 9, 837 A.2d 129. "Failure to demonstrate that any one of these criteria are met requires that

---

3 The court need not address the lack of standing claim raised by the Department and the intervener because of the outcome of this decision.

6

injunctive relief be denied." *Id.* at ¶ 10 (citation omitted). Plaintiffs bear the burden of demonstrating these factors weigh in favor of an injunction. *Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006) (citation omitted).

Likelihood of Success on the Merits

### 1. Legal Standard

The only Maine case that has addressed the issues of whether state officials can advocate for or against a ballot measure and whether the officials may use public funds to support their advocacy is *Campaign for Sensible Transportation v. Maine Turnpike Authority*, 1991 Me. Super. LEXIS 228 (Oct. 8, 1991). In that case, Justice Alexander found that no other Maine cases addressed the issues but noted that "precedent in other states suggests that absent specific legislative authorization, public agencies may not spend public funds to take sides in elections and attempt to influence results." *Id.* at *6.

Plaintiffs in that case alleged that the Turnpike Authority improperly used public funds "to oppose an upcoming referendum on Turnpike widening and transportation planning." *Id.* at *1. Plaintiffs alleged that the Turnpike Authority had published newsletters and hosted luncheons that were designed to influence the election. The court relied on *Citizens to Protect Public Funds v. Board of Education of Parsippany-Troy Hills*, 98 A.2d 673 (N.J. 1953) and *Stanson v. Mott*, 551 P.2d 1 (Cal. 1976).

In 2004, the Maine Attorney General at the time, G. Steven Rowe issued an opinion about his understanding of the law regarding "whether state and local government officials can advocate for or against a citizen initiated ballot measure, and whether those officials can use public funds to further those efforts." Op. Me. Att'y Gen. 04-05. The opinion characterized *Campaign for Sensible Transportation*

7

as clearly stating the guiding principles of the law "in a manner that is consistent with the case law from other jurisdictions." *Id.* at *3. The opinion concludes,

> Governmental bodies and officials may not expend public funds solely or primarily for purposes of partisan advocacy without express authorization, and even where authorized, these activities are subject to constitutional limits. They may disseminate information on matters such as citizen initiatives and may express their views as public officials. We have found no case concluding that public resources such as personnel time cannot be used in support of these allowable activities. However, the line between appropriate dissemination of relevant information and activities that constitute improper advocacy by government agencies and officials is not easy to define in the abstract. Such determinations are fact-dependent and may be complex, particularly in situations such as this where the subject matter of the issue before the voters has a direct and substantial impact upon the duties and responsibilities of those government agencies and officials.

*Id.* at *3 (footnote omitted). Contrary to DIFW and MWCC's arguments, *Citizens to Protect Public Funds* and *Stanson,* upon which *Campaign for Sensible Transportation* is founded, are still good law where the invalidation of the expenditures was based on legislative enactment (or an absence thereof) and not on the First Amendment. *See, e.g., Kidwell v. City of Union,* 462 F. 3d 620, 629 (6th Cir. 2006) (Martin, J. dissenting); *Santa Barbara County Coal. Against Auto. Subsidies v. Santa Barbara County Assn. of Gov'ts,* 84 Cal. Rptr. 3d 714, 722 (Cal. Ct. App. 2009) ("Although a government agency cannot spend public funds in a partisan campaign for the passage or defeat of a ballot measure, we conclude that, in this case, the activity . . . was not electoral advocacy because it was in furtherance of its express statutory duties and occurred before Measure A was qualified for placement on the ballot.") However, this is not the only analysis to consider. In the proper case, the government speech doctrine may apply, as DIFW and MWCC argue here.

8

## 2. *Ultra Vires*

Before considering the impact of the government speech doctrine to this case, the court considers whether DIFW's activities are *ultra vires*, as alleged by plaintiffs, who contend that there is no specific legislative authorization for DIFW's campaign activities. Even though *Campaign for Sensible Transportation* concluded that "absent specific legislative authorization, public agencies may not spend public funds to take sides in elections and attempt to influence results", 1991 Me. Super. LEXIS 228, at *6, this court concludes that DIFW's activities are authorized by the constellation of statutes directing DIFW's responsibilities. Here DIFW's statutory authorizations and directives are sufficiently broad to encompass its activities with respect to the management of bears and Question 1. DIFW is charged with "the administration and enforcement of the inland fisheries and wildlife laws and . . . the responsibility for the management of all inland fish and wildlife in the State." 12 M.R.S. § 10103(2). DIFW is directed "to preserve, protect and enhance the . . . wildlife resources of the State; . . . to ensure coordinated planning for the future use and preservation of these resources; and to provide for effective management of these resources." 12 M.R.S. § 10051. Plaintiffs concede that this includes "the authority to administer hunting and trapping programs consistent with wildlife management goals set by subdivision of the Department, conduct studies of wildlife populations, and promote and educate the public about Maine's resources." Pl.'s Compl. p. 4. These grants of authority are not comparable to the far more limiting list of enumerated functions of the agency in *Campaign for Sensible Transportation.*

Furthermore, the Department is mandated to "encourage the wise use of [wildlife] resources." 32 M.R.S. § 10051. Thus, DIFW is statutorily required "to

9

attempt to persuade" the public to make wise of these resources, or to make wise use "more appealing or more likely to happen." Merriam-Webster Online Dictionary, "encourage," http://merriam-webster.com/dictionary/encourage, last visited 10/22/2014. The Department is also charged under 12 M.R.S. § 1056 with "increas[ing] the public's knowledge and understanding of inland . . . wildlife resources and the management of these resources." This statutory language expressly directs DIFW to advocate for its positions regarding wildlife management, including bear management. Additionally, in "implement[ing] a program designed to promote . . . wildlife resources and attract hunters . . . to the State," the Commissioner is granted discretionary authority to "coordinat[e] . . . activities between the public and private sectors and utilize[e] . . . promotional missions, exhibits, brochures, technical assistance and expertise as necessary to develop and promote hunting . . . activities within the State." 12 M.R.S. § 10108. Thus, this Court finds that there is express legislative authorization for the activities DIFW has engaged in this campaign against Question 1.

### 3. Government Speech Doctrine

The next question is whether the government speech doctrine applies to the facts in this case. The government speech doctrine provides that government speech "is not restricted by the Free Speech Clause." *Adams v. Me. Mun. Ass'n*, 2013 WL 9246553, at *16 (D. Me. 2013) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009)). In other words, "the Government's own speech is exempt from First Amendment scrutiny." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005). "Whether the protections of the government speech doctrine are available . . . depends on the content of the challenged speech and the legal theory argued by the challenger." *Adams*, 2013 WL 9246553, at *19. In *Adams*, the

10

District Court followed the Fourth and Sixth Circuits "in declining to craft a bright line political or campaign speech exception to the government speech doctrine." *Id.* at *22. The District Court observed that MMA's advocacy activities related to initiatives that it perceived would have serious consequences for municipal governments. *Id.* The District Court in *Adams* resolved all of the federal claims, including a count alleging "the government taking sides" and "direct governmental interference with an initiative", as sounding under the Free Speech Clause of the First Amendment and held that "the government speech doctrine applies to MMA's advocacy activities." *Id.* at *23.

MFBH's claim in Count II of their Complaint also sounds under the Free Speech Clause even though plaintiffs take great care to say they are not mounting a constitutional challenge. Although at first blush, an ordinary citizen may question the appearance of uniformed Game Wardens in advertisements paid for by a private group and advocating for a particular point of view, the government speech doctrine protects expenditures on speech-related activities when the "speech is germane to a legitimate government interest", *Adams*, 2013 WL 9246553, at *19 (citing *Kidwell v. City of Union*, 462 F. 3d 620, 626 (6th Cir. 2006)), and whether the government entity is subject to democratic accountability and political safeguards. *Id.* at *21 (quoting *Bd. of Regents of Univ. of Wis. System v. Southworth*, 529 U.S. 217, 235 (2000)).

The doctrine of government speech arises most often in the context of complaints that government speech expressing or promoting particular viewpoints violates the free speech rights of citizens with opposing views. Plaintiffs' argument is best summed up by DIFW as, "by voicing a viewpoint in opposition to Plaintiffs' own, DIFW has interfered with Plaintiffs' ability to

11

deliver its message." Def.'s Opp. at n.2. Although Plaintiffs take great care to state that their claim is not a constitutional claim, this court concludes that there is a free speech argument. Plaintiffs' claim in their Complaint that DIFW has impaired their "constitutional right to advance Question 1," and also that DIFW's actions have "harmed Plaintiffs' campaign." Pl.'s Compl. at p. 22. Thus, Plaintiffs' claim in Count II clearly sounds in free speech and the government speech doctrine applies. The law has consistently held over the last twenty years, that when governments "engage[] in their own expressive conduct, then the Free Speech Clause has no application." *Pleasant Grove City*, 555 U.S. at 467.

Pursuant to the government speech doctrine, a governmental entity "is entitled to say what it wishes," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995), and to choose "viewpoints when the government itself is speaking." *Griswold v. Driscoll*, 616 F. 3d 53, 58-59 (1st Cir. 2010) (citing *Pleasant Grove City*, 555 U.S. at 467.) Moreover, after choosing its message, as the Supreme Court provided:

> Compelled support of government – even those programs of government one does not approve – is of course perfectly constitutional, as every taxpayer must attest. And some governmental programs involve, or entirely consist of, advocating a position. The government, as a general rule, may support valid programs and policies by taxes or other exactions binding on protesting parties. Within this broader principle it seems inevitable that funds raised by the government will be spent for speech and other expression to advocate and defend its own policies.

*Johanns*, 544 U.S. at 559 (internal quotation marks omitted.) Thus, the government speech doctrine allows governmental entities to expend funds on position-based speech.

Government accountability protects those who disagree with government actions or speech, and belies the need for additional first amendment protections.

12

The governmental speakers, after all, are "ultimately accountable to the electorate through the political process, which is the mechanism to test disagreements." *Newton v. Page*, 700 F. 3d 595 (1st Cir. 2012) (citing *Bd. of Regents of Univ. of Wis. Sys.*, 529 U.S. at 235; *Sutcliffe v. Epping Sch. Dist.*, 584 F. 3d 314, 331 n.9 (1st Cir. 2009)). The Supreme Court has observed that "[w]hen the government speaks, for instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy. If the citizenry objects, newly elected officials later could espouse some different or contrary position." *Bd. of Regents of Univ. of Wis. Sys.*, 529 U.S. at 235. Here, DIFW is a government agency, ultimately accountable to the electorate, and the speech at issue is germane to DIFW's statutory directives. Hence, the government speech doctrine applies and blocks Plaintiffs' claim to the extent it is premised upon first amendment rights. Thus, Plaintiffs are unlikely to prevail on the merits of their claim in Count II.

Irreparable Injury, Balancing of Harms and Public Interest

Plaintiffs have failed to articulate an irreparable injury. Plaintiffs allege that the injury is the continued use of agency funds to oppose Question 1 and to affect the outcome of the referendum vote. First, DIFW has stopped and does not intend to expend any additional funds on the campaign. Second, the TV advertisements are the property of MWCC and the plaintiffs have advanced no basis for enjoining MWCC. Third, the speech the plaintiffs seek to enjoin is part of the marketplace of ideas that best supports democracy. This decision should

---

4 The speculative opinions propounded by Robert G. Meadows do not qualify as admissible expert or lay opinion on the existence of an irreparable harm. Under M.R. Civ. P. 65, a request for injunctive relief must be supported by evidence addressed to specific facts sufficient to demonstrate the existence of irreparable injury. Plaintiffs have failed to do this.

13

not be read as an endorsement of DIFW's campaign activities as a matter of policy; but, rather a subscription to the point of view articulated by the District Court in *Adams* that "more speech is better than less, and the Plaintiffs remain free to make their own voices louder and more persuasive in the marketplace of ideas." *Id.* at *25. If Plaintiffs do not like DIFW's speech, its remedy is to vote out of office or limit the conduct of those officials by law by petitioning the Maine Legislature to pass a law limiting DIFW's ability to fund and participate in campaign activities either on its own or in conjunction with other groups such as Ballot Question Committees.

Restricting speech on contested public issues is directly contrary to the public interest, which favors a robust and dynamic public discourse. *See Buckley v. Valeo*, 424 U.S. 1, 48-49 (1976) (noting that the First Amendment "was designed to secure the widest possible dissemination of information from diverse and antagonistic sources, and to assure unfettered interchange of ideas for the bringing about of political and social changes . . . .") (internal citations and quotation marks omitted). It is the voters, not the Plaintiffs or the courts, to assess the relative merits of conflicting speech. *See First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 790-91 (1978) ("[T]he fact that advocacy may persuade the electorate is hardly a reason to suppress it . . . the people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments.") The public interest would be adversely affected if Plaintiffs' request for a TRO were granted when DFIW's speech is on topics

14

squarely within "its competence as governor." *Kidwell*, 462 F. 3d at 626.⁵ "If the citizenry objects, newly elected officials later could espouse some different or contrary position." *Bd. of Regents of Univ. of Wis. Sys.*, 529 U.S. at 235. In the meantime, DIFW's advocacy activities are based on their experience and expertise and relate to initiatives that it perceives would have serious consequences for their effective management of Maine's bear population.

The entry is:

  Motion for a Temporary Restraining Order is DENIED.

Date: October 22, 2014

Joyce A. Wheeler, Justice

---

5 Given the decision in this case, the court does not address whether the relief requested by Plaintiff would constitute prior restraint on either DIFW or MWCC. The court also does not need to address any other arguments raised by any of the parties.

**CLERK OF COURTS**
Cumberland County
205 Newbury Street, Ground Floor
Portland, ME 04101


RACHEL WERHEIMER ESQ
VERRILL DANA
PO BOX 586
PORTLAND ME 04112-0586

*Plaintiff's Attorney*


SCOTT BOAK AAG
ATTORNEY GENRAL OFFICE OF AG
111 SEWALL STREET
6 STATE HOUSE STATION
AUGUSTA ME 04333-0006

*Defendant's Attorney*


PAUL MCDONALD ESQ
BERNSTEIN SHUR SAWYER & NELSON
PO BOX 9
PORTLAND ME 04104-5029

*Intervenor's Attorne*